## In re LENT.

### No. 6249.

District Court, W. D. Louisiana, Shreveport Division.

Sept. 13, 1940.

R. B. Williams, of Natchitoches, La., for bankrupt.

J. M. Grimmet, of Shreveport, La., referee.

Cook, Cook & Egan and Albert T. Hughes, Jr., all of Shreveport, La., for Superior Iron Works & Supply Co.

Goodwyn Harris, Jr., of Mansfield, La., for Abe Mahfouz.

Russell E. Gahagan, of Natchitoches, La., for T. M. Berry and J. C. Walker.

PORTERIE, District Judge.

For the statement of facts of this case, we quote from the opinion of the referee:

"The Superior Iron Works & Supply Company sold to Jack F. Lent, on November 28, 1938, a draw works for the price of $1,600.00, $750.00 of which was paid in cash. Jack F. Lent executed a chattel mortgage note in the amount of $850.00 for the unpaid balance, which was secured by a vendor's lien and chattel mortgage duly executed that day. This was recorded on the same day in Caddo Parish, Louisiana, and a certified copy of this chattel mortgage and vendor's lien was recorded also in Natchitoches Parish, Louisiana, on that day, November 28, 1938. Subsequently, the Superior Iron Works & Supply Company, Inc., sold to Jack F. Lent a gas engine and a 12″ belt, together with other smaller items, the purchase price of which totaled $791.80. At that time, on March 30, 1939, Jack F. Lent executed another note in the amount of $700.00, which was likewise secured by a chattel mortgage and vendor's lien on the gas engine and belt. This mortgage was recorded on March 30, 1939, in Caddo Parish, Louisiana, and on the same day in Natchitoches Parish, Louisiana, in the chattel mortgage records. According to the testimony of Jack F. Lent, which appears in the record, this property was sold and the mortgages recorded before any work was done using the said equipment.

"Jack F. Lent, the bankrupt, has for several years been engaged in the drilling of wells, principally in the parish of Natchitoches, in search of oil, gas and other minerals. During the year of 1939 he drilled two wells in Natchitoches Parish, near Ajax, one known as the Walker Well and the other known as the Whatley Well. Lent did not pay the laborers who worked for him on these wells and certain of them filed liens under the provisions of Act No. 145 of 1934. These liens were later reduced to judgment wherein the liens were recognized. Under the judgments in favor of T. M. Berry in one suit and J. C. Walker in another suit, the property of the said Lent was seized and advertised for sale by the Sheriff of Natchitoches Parish. Lent then filed his petition and was adjudged a bankrupt.

"T. M. Berry and J. C. Walker have both filed petitions in this proceeding, wherein they ask, under the provisions of Act 145 of 1934, to be paid the amount of their claims by preference and priority over the claims of the Superior Iron Works, Inc."

The referee ordered the claims for wages under the liens to be recognized as superior in rank to the claim of the furnisher of equipment under its chattel mortgages and vendor's liens. Appeal has been taken from this order.

What have the agencies of the people said of the vendor's lien on movables?

The drafters of the Constitution of 1921 said as follows: Article XIX, Sec. 19: "Privileges on movable property shall exist without registration of same except in such cases as may be prescribed by law." (Consult Official Journal of the Constitutional Convention of 1921, Ordinance No. 52, Ordinance No. 99, pages 49, 67, 531, 573.) And for several Constitutions (1913, art. 187, 1898, art. 187, and 1879, art. 177) in the past the expression has been consistently the same.

It is conceded that the lien on movables has been considered of such a high rank that the provision for a registry or recordation, as such, has never been made by law for sixty-one years, that is, until presumably provided for by Act No. 100 of 1940. The underlying reason for this was that the legislators felt the lien should not be hampered; the necessity of recordation weakened the lien—for the mere neglect of recordation would cause its loss as to third parties.

We have the compilers of our Civil Code, who said as follows: Article 3227:

"He who has sold to another any movable property, which is not paid for, has a preference on the price of his property, over the other creditors of the purchaser, whether the sale was made on a credit or without, if the property still remains in the possession of the purchaser.

"So that although the vendor may have taken a note, bond or other acknowledgment from the buyer, he still enjoys the privilege."

We next come to the expressions of the several legislatures. This opinion need not be burdened with a study of the comparative high rank of the vendor's privilege to the numerous other privileges; but, of necessity, we need to compare the ranking of the vendor's lien on movables only with the oil laborer's lien. This is the crux of the case. At time of this controversy, the most recent legislative expression comparing the oil laborer's lien with that of the vendor of movables was found in Act 145 of 1934, and, particularly, in the following language (the laborer's lien): "shall be superior to all other liens and privileges or mortgages against said property, except taxes or a bona fide vendor's lien and privilege, provided such vendor's lien and privilege exists and is recorded before the work [etc.] is begun." Section 2.

It is clear that the laborer's lien is made subordinate to the vendor's lien if the oil laborer is on notice that the rigging or equipment which he used in his work was totally or partly unpaid.

It is not surprising that the drafters of the Constitution, the compilers of our ·Code, and the makers of our laws should have given strong legal recognition and ranking to the great equitable principle that the property of one should not be taken to pay the debt of another. The unpaid purchase price on a thing makes the thing in equity the property of the unpaid vendor and not the property of the owner in title. The legislative expression is that this equitable principle dominates even the humane principle of protecting the day laborer in his hire if the day laborer be on notice of the existing equity.

Drafters of the Constitution and compilers of Codes work in the absence of pressure from interested groups; legislatures work, and very properly so in a democratic form of government, under the pressure of interested groups. The complexity of modern commercial relations, bringing about so many privileges that have to be ranked, makes it impossible in the short time of a legislative session for any committee of the legislature to be able to harmonize the numerous laws on the subject. The sacrifice of time would be too great in the face of other demands. The legislator does his best by keeping the law, pressed by interested groups, within reasonable bounds. The legislature acts with the knowledge that another department of the government, the judiciary, will have the problem of ironing out inconsistencies and solving conflicting principles. Legislation is thus made supple.

This court is impressed strongly by the fact that the Legislature, at the time of passing Act 145 of 1934, acting under the pressure of an interested group representing day-laborers, even then did not fail to recognize the superiority of the vendor's. lien on movables as against the oil laborer's lien on the same movables. It is important to note that the movable is merely being used by the laborer in his work; it is not a product of his work. Therefore, under these circumstances, the quotation we have made from Act 145 of 1934 is the equivalent of an admission by the interested group that the oil laborer's lien is subordinate to the vendor's lien if the laborer went on the job knowing of the existing lien on the movable.

What have we in this case? We have the immediate recordation by the vendor of the chattel mortgage, containing the vendor's lien, in the parish of the situs of the contract and in the parish of the location of the drilling movable. The recordation is admitted by all parties to be before the workers began to use the movable.

The recorded act of chattel mortgage in this case contains the following paragraph: "Being the same property this day sold by said mortgagee to said mortgagor for the total consideration of (in one mortgage, $700.00; in the other, $1,-600.00) the unpaid portion of purchase price being represented by hereinabove described mortgage and for which amount the mortgagee herein retains Vendor's Lien and Privilege."

It is one single act; it includes three main divisions: (a) the declaration of the indebtedness and its representation by a negotiable note, (b) the special hypothecation of the chattel to secure the payment of the note, (c) the declaration of the vendor's lien and privilege and its definite

retention. There can be no recordation of a part of the act and the elimination of the recordation of the other. The vendor of the drilling rig did all that was legally possible to follow the provisions of Act 145 of 1934. When the Legislature said "and is recorded," it meant just what was done here, when the unpaid vendor recorded the whole chattel mortgage act, retention of vendor's lien included. It must be admitted that the laborer was in direct or implied notice of the purchase price being unpaid and, therefore, of the existence of the vendor's lien.

The court is of the unqualified opinion that the Legislature, in passing Act 145 of 1934, meant that in a factual situation as shown in this case the oil laborer's lien was secondary to the vendor's lien on the rig.

We, as judges, are prone to be logomachic. We take the word "recorded" (from Act 145 of 1934) and begin to play with it. Then, the judge says that the *paragraph* disclosing the vendor's lien and privilege, even though recorded as a part of the whole act of chattel mortgage, *was not "recorded"*; second, that there was no provision of law in the long history of Louisiana providing for "recordation" of a vendor's lien on movables; third, that the legislature knew that; finally, therefore, the judge says that the legislature, when it wrote the language quoted from Act 145 of 1934, required the doing of an impossible thing; and all this the legislature did purposefully and knowingly. By the logomachic judge, what to the layman seems to be so clearly the import of the language of the statute is made to say just the opposite. What hypocrisy is charged thus to the legislature?

We cannot and should not subscribe to the above reasoning. Giving effect to the plain purpose of the language, which is to protect the unpaid vendor, is our duty and our view of the law.

But it is said that by Act 100 of 1940, the Legislature has finally and eventually provided for the recordation of a vendor's lien on a movable. What has it provided that was not done in the instant case? The only thing is that the clerk of court is now required to put the words "Vendor's Lien" in the *chattel-mortgage index book* under the previously provided heading of "Remarks." Where will the clerk of court find his direction, in practice, to make the notation "Vendor's Lien"? He will find it by reading the body of the act of chattel mortgage, in the paragraph showing retention of the vendor's lien and privilege. The whole act, likewise, including the specific retention by the vendor-mortgagee of his vendor's lien, was recorded in this case.

An index is merely a ready means of arriving at that which one seeks. It is not the real thing sought, nor is it the document recorded.

The clerk indexed the chattel mortgage act of this case. All of the act was recorded, including the vendor's lien. That is all the Legislature required in the Act 145 of 1934. How can the laborers in the instant case claim that there was want of notice to them that the rigging they were going to work with was unpaid? The vendor did all possible to give notice of his lien—and promptly too. He should not suffer through a far-fetched technicality of law when all the equities are with him.

Our conclusion is, therefore, that under the oil laborer's lien law itself, Act 145 of 1934, the claims for labor herein are subordinated to the claim of the unpaid vendor.

The court has well noticed that Section 2 of Act 145 of 1934, in its general language, presupposes a recordation in the *"mortgage records"* of the parish, because a lien may be given the laborer even against the mineral lease, a real right, or to ten acres of land around the well. But we are unable to follow the reasoning which has been made in this case, wherein only a movable is involved, that the recordation of the vendor's lien *on a movable* should be made in the "mortgage records of the parish", meaning here the records which, from time immemorial, have involved immovables—and immovables only.

No facts appear which would immobilize the equipment to the mineral lease, or to ten acres of real estate about the well. So, the argument by the laborers that the vendor's lien on the movable should have been recorded, to affect third persons, in the mortgage records is inapplicable. Louisiana Civil Code, Arts. 3329, 3386–3396 as to mortgages on immovables; 2254 and 2442 as to sales of immovables.

This court is of the additional view that a separate and distinct reasoning exists, under the facts and law of this case, leading to the same conclusion.

Act 145 of 1934 is, chronologically, between two definite chattel mortgage acts—

Act 198 of 1918 and Act 178 of 1936. Here is the comparison of Section 4 of the two chattel mortgage acts:

1918 Act: "Section 4. Be it further enacted, etc., that every mortgage shall be a lien on the property mortgaged from the time same is filed for recordation, which filing shall be notice to all parties of the existence of such mortgage, and said lien shall be superior in rank to any privilege or lien arising subsequently thereto."

1936 Act: "Section 4. Every such mortgage shall be a lien on the property mortgaged from the time same is filed for recordation, which filing shall be notice to all parties in the State of the existence of such mortgage, and said lien shall be superior in rank to any privilege or lien arising subsequently thereto."

The only added language, by the later act, is the phrase "in the State." This, however, is not the only legal significance of the later 1936 act.

■ When Act 145 of 1934 was passed, it being a special act dealing with a particular privilege, that to be given to the oil laborer, it may be said to have modified the meaning of the chattel mortgage act of 1918. The act of 1918 was general in character as to chattel mortgages and, as a class, established their rank and privilege. A chattel mortgage as provided for in 1918 could be for the satisfaction of a fresh loan on a totally paid-for movable, or be for the more effectual payment of a debt due to the unpaid vendor of the movable, or be even to secure an amount due an oil laborer for his hire, etc. When Act 145 of 1934 was passed, however, the oil laborer's lien for his hire on the equipment he used in his work became superior to any chattel mortgage on the equipment, except one based on a vendor's lien and recorded before the laborer used the equipment. This was an amendment by implication to the 1918 act. Louisiana Civil Code, Arts. 22 and 23.

The Legislature then comes back in 1936 and re-enacts in substantial manner the 1918 act; however, repeats Section 4 verbatim. This is legislative reaffirmation of what was originally said in 1918, in the face of Act 145 of 1934. The implied amendment of the act of 1918 by Act 145 of 1934 is, therefore, nullified.

■ It is consequently the opinion of the court that the chattel mortgage act as timely recorded herein, forgetting the language

showing the vendor's lien, is, by itself, superior to the oil laborer's lien because of the strict and positive language of Section 4 of Act 178 of 1936—the latest expression, of the legislature at time of this suit—which says quite distinctly "every such mortgage shall be a lien on the property mortgaged from the time same is filed for recordation, which filing shall be notice to all parties in the State of the existence of such mortgage, and said lien shall be superior in rank to any privilege or lien *arising subsequently thereto.*" (Italics supplied.)

We arrive for the second time at the same conclusion.

There has been reflection in the jurisprudence of the state of the great equity of the vendor's lien. This is clearly and strongly expressed in the case of Weiss v. Hudson Construction Co. et al., 151 La. 1094, 91 So. 525, wherein it is held that under the provisions of the Constitutions of 1879, 1898, 1913 and 1921, and the Civil Code articles 3186 and 3227, relative to privileges, and Act 198 of 1918, relative to the recording of chattel mortgages, a vendor's privilege on movable property, though unrecorded, is superior to a subsequently recorded chattel mortgage.

Let us take a new approach to the same question. We have now in mind Act 145 of 1934, and we are taking for granted that the Legislature was hypocritical and, though knowing that there was no special means existing for the recordation of the vendor's lien on movables, it purposefully put in the language using the word "recorded."

In this situation, the vendor's lien on movables, though unrecorded, has still to be given its legal, inherent force. At the moment of sale of this drilling outfit to Jack Lent, "such vendor's lien and privilege exists"; it is also "a bona fide vendor's lien and privilege" (quoting from Act 145 of 1934). An admission of fact not in dispute is that the laborers went to the job and used the drilling outfit subsequent to the existence of the vendor's lien.

■ The view of this court is that the words of the laborer's lien statute, Act 145 of 1934, "and is *recorded* before the work * * * is begun," are mere surplusage, meaningless and ineffectual. It provides for something that cannot be done.

By analogy we have to come to the doctrine of the Weiss v. Hudson Construction

Co. case. There the vendor's lien, though unrecorded, if it existed before the registry of a chattel mortgage, primed the chattel mortgage. The Constitution says the vendor's lien *exists* without the necessity of recordation.

Consequently, we must give effect to its existence in the present case. It existed at the time that the laborer went on the job. Under the law, he is under implied notice, if not direct notice. We conclude again that under the Constitution, the acts of the Legislature, and particularly Act 145 of 1934, the only avenue through which the laborer's hire can be classified herein, the unpaid vendor of the movable in this instant case should be paid ahead of the oil laborer.

In our reasoning here (and throughout this opinion) we agree with the case of Coffey v. Pickett (Brannon, Intervenor), La.App., 189 So. 461, where it is held that the constitutional provision refers only to the *existence* and not to the rank of vendor's liens.

Counsel for Superior Iron Works & Supply Company make the point that the provision "and is recorded before the work is begun" in Act 145 of 1934 is unconstitutional because, if it be supposed to provide for a new method of recordation of a vendor's lien on movables, there is no such provision in the title of the act; the title of the act not supporting the expression in the body, the expression must be eliminated. Louisiana Constitution, Art. III, Sec. 16; Harman & Stringfellow v. Legrande, 151 La. 253, 91 So. 726; Gulf Ref. Co. of Louisiana v. McFarland, 154 La. 251, 97 So. 433; Stinson v. Exchange Bank & Tr. Co., 171 La. 169, 129 So. 807; Moore v. Payne, D.C., 35 F.2d 232; First National Bank of Shreveport, La., v. Sharp, 5 Cir., 54 F.2d 886. Then the section would read that the laborer's hire is subordinate to "taxes, or a bona fide vendor's lien and privilege, provided such vendor's lien and privilege exists." It is clear that our former conclusion is again verified.

Accordingly, we feel constrained to reverse the findings of the referee, and decree that the claim of the Superior Iron Works & Supply Company primes in rank the claims of the laborers on all the equipment it sold to Lent, or on the proceeds of the sale thereof. Judgment accordingly will be signed upon presentation.