CONTINENTAL CASUALTY COMPANY

v.

ASSOCIATED PIPE & SUPPLY CO.,
Inc., et al.

TEXACO, INC.

v.

OFFSHORE GATHERING CORP. et al.

UNDERWATER SERVICES, INC.

v.

OFFSHORE GATHERING CORP.

COMMONWEALTH OIL COMPANY, DI-
VISION OF JUPITER CORPO-
RATION, Inc.

v.

OFFSHORE GATHERING CORP. et al.

UNITED TUGS, INC.

v.

CONTINENTAL CASUALTY COMPANY,
Texaco, Inc. and Offshore Gather-
ing Corp.

Civ. A. Nos. 12713, 12714, 12681,
12701 and 12579.

United States District Court
E. D. Louisiana,
New Orleans Division.

Dec. 13, 1967.

Eugene D. Saunders, Lawrence K. Benson, Jr., K. H. Gilly and Ernest L. O'Bannon, New Orleans, La., for Thos. Jordan, Inc. and Associated Pipe & Supply Co., Inc.

Rbt. D. Edwards and John E. Fleury, Gutna, La., for Pipe Line Serv. Corp.

Geo. A. Frilot, III, New Orleans, La., for Ayers Materials Co., Inc.

Quinton T. Hardtner, III, for D. E. Stearns Co.

Wm. A. West, Jr., New Orleans, La., for Evans Cooperage Co., Inc.

Cicero Sessions and Donald P. Endom, Michale J. Molony, Jr., New Orleans, La., for Howard T. Tellepsen, d/b/a Tom Hichs Transfer Co.

John B. Hattier, New Orleans, La., for Leson Chevrolet Co., Inc.

Vincent C. Rodriguez, New Orleans, La., for Acme Truck Line, Inc.

Melvin J. Duran, New Orleans, La., for Gerhardt's Inc.

Richard J. McGinity, Jr., New Orleans, La., for Offshore Gathering Corp.

Robert Rainold, Robert E. Leake, Jr., New Orleans, La., for Wigwam, Inc.

James O. Manning, New Orleans, La., for Borrucci Bros. Construction Co., Inc.

Melvin W. Mathes, New Orleans, La., for Electronic Service, Inc.

T. M. McBride, III, Arabi, La., for Frolich Bros. Marine Divers, Inc.

Patrick J. Butler and William J. Wegmann, New Orleans, La., for O. S. Justus, d/b/a Globe Equipt. Co.

Milton L. Williams, Shreveport, La., for Williams Pressure Service.

A. D. Freeman, Jr., New Orleans, La., for B & G Lumber Co., Cran Rental Co., Buras Drugstore, C. L. Dill Co., and E. N. Despaux.

Patrick E. Carr, Metaire, La., for John R. Lambert, Jr., and Marshland Aviation, Inc.

Sidney W. Provensal, Jr., New Orleans, La., for Ellzey Marine Supplies, Golden Meadows Oil Co. and Irby Charping.

Warren M. Simon, Jr., New Orleans, La., for New Orleans Armature Works, Inc.

Felix W. Gaudin, New Orleans, La., for New Orleans Blue Print & Supply Co.

A. Morgan Brian, Jr., New Orleans, La., for Continental Cas. Co. and Texaco, Inc.

Richard Blaise Jurisich, New Orleans, La., for Tassin Marsh Equipment Co.

E. Howard McCaleb, Jr., William W. Messersmith, III, and James J. Morrison, New Orleans, La., for Empire Machine Works, Inc.

Daniel P. Hurley, Wiley G. Lastrapes, New Orleans, La., for Texaco, Inc.

John M. Page, New Orleans, La., William Vandry, for Circle, Inc.

Warren Rush, Lafayette, La., Harold B. Judell, New Orleans, La., for Glaser Construction Co., Inc.

Robert G. Hebert, Herbert O'Neill, Thibodaux, La., for Alcide Bernard.

Joseph E. Friend, New Orleans, La., for Industrial Welding Supply Co.

Emile Turner, Peter L. Bernard, Jr., New Orleans, La., for Underwater Services, Inc.

Cicero C. Sessions, New Orleans, La., Edward T. Diaz, Golden Meadow, La., for United Tugs, Inc.

Gilbert P. Cohen, Gutna, La., Paul F. Rogyom, Kenner, La., and Rbt. I. Broussard, Gutna, La., for Boechk Engineering Co., Crescent Welding and Charles Spahr.

Peter H. Beer, New Orleans, La., Richard Cocke, Houston, Tex., for Commonwealth Oil Co.

Charles J. Hanemann, Jr., New Orleans, La., Philip E. Henderson, Joseph L. Waitz, Houma, La., for Foods and Service, Inc.

CASSIBRY, District Judge:

The principal issues involved in this case are whether the Louisiana Private Works Act [1] or the Louisiana Oil, Gas and Water Wells Act [2] (hereafter referred to as Oil Well Act) afforded lien coverage to suppliers of material, labor and services on an oil pipeline construction project which extended from land upon the Outer Continental Shelf of the Gulf of Mexico. Both Acts clearly cover the project involved, and I so hold.

Texaco, Inc. (hereafter called Texaco) and Offshore Gathering Corporation (hereafter called Offshore) entered into a contract dated October 27, 1961, and executed in writing November 1, 1961, which called for Offshore as prime contractor to construct for Texaco as owner, an underwater-underground pipeline gathering system to service Texaco's offshore oil and gas field known as South Pass Area Block 37. The pipeline is known as the "South Pass Gathering System." In connection with the above contract, Offshore provided Texaco a performance-indemnity bond with Continental Casualty Company (hereafter called Continental) as surety thereon. The original bond dated November 29, 1961, was in the amount of $397,000. By rider dated December 11, 1961, the amount of the bond was increased to $442,000. Neither the contract nor the bond and its rider were ever recorded. The work under the contract was completed by Offshore and accepted by Texaco on May 28, 1962. At that time many parties who had furnished labor, materials, equipment or services in connection with the contract were unpaid. After completion of the job and after deducting the progress payments which it

1. La.R.S. 9:4801 et seq.

2. La.R.S. 9:4861 et seq.

had made to Offshore, Texaco still had on hand $178,796.16 which it owed to Offshore under the contract. But since Offshore had failed to pay the many suppliers and creditors, Texaco withheld the balance which it was entitled to do under its contract with Offshore, and filed its interpleader and deposited the money in the registry of the Court.

In the Continental interpleader action, Continental has placed in the registry of the Court $442,000, the full amount of its bond. Many of Offshore's creditors have filed claims upon the funds deposited in the Texaco interpleader and some of these creditors, having recorded liens, also filed claims under Louisiana lien laws. Some creditors also filed claims against Continental under the bond. Texaco concedes that if no lien law is applicable to the work performed by Offshore, it (Texaco) will be a mere stakeholder and have no interest in the fund. If, on the other hand, any claims filed against Texaco itself are valid, then Texaco does assert an interest in the fund for reimbursement of any sums it is called upon to pay. Continental denies any liability in the matter except as to indemnity it may owe Texaco to reimburse it for losses incurred as a result of claims filed under lien laws. In addition to the many claims made by creditors in the interpleader actions, three suits were filed by parties directly against Texaco and Continental. These suits have been consolidated with the interpleaders and all have been tried together.

Two of the claimants, United Tugs, Inc. (hereafter called United), and Thomas Jordan, Inc. (hereafter called Jordan), claim Offshore made assignments to them of contract funds in Texaco's hands which Texaco agreed to, and that Texaco independently guaranteed to pay United and Jordan what was due them to insure completion of the job.

The issues then, to be decided, are as follows:

(1) Whether the construction project performed by Offshore is of a nature contemplated by and within the scope of the Louisiana Private Works Statute, LSA–R.S. 9:4801 et seq.

(2) Whether the construction project performed by Offshore is of a nature contemplated by and within the scope of the Louisiana Oil, Gas and Water Well Statute, LSA–R.S. 9:4861 et seq.

(3) Whether Continental is liable to certain claimants by virtue of the bond it executed as surety for Offshore.

(4) The validity of assignment of contract funds made by Offshore to United and Jordan and/or whether Texaco made an independent promise or guaranty to pay the claims of United and Jordan.

Before discussion of these issues a closer look at the work performed by Offshore would be in order.

Texaco's "South Pass Gathering System," constructed and installed by Offshore, is a gathering system of pipelines through which fluids, including gas, move from well sites in the offshore field in the Gulf of Mexico (South Pass Area Blocks 37 and 38) to Texaco's inshore terminal located in the marshlands of Garden Island Bay in lower Plaquemine Parish, Louisiana. The gathering system consists of a series of connected pipelines. Fluids from well sites at "A", "B" and "D" Structures move through shorter pipelines to a central platform called "C" Structure, then, together with fluids from well sites at "C" Structure, move through a longer 12-inch pipeline to the inshore terminal for processing. (See Sketch "I")

The three shorter pipelines are as follows: (i) a 12-inch pipeline running between "D" Structure and "C" Structure; (ii) a 6-inch pipeline running between "B" Structure and "C" Structure; and (iii) a 4-inch pipeline running from "A" Structure to "C" Structure. These offshore platforms ("A", "B", "C" and "D") were constructed by Texaco, and are fixed to the Gulf bottom.

The method of laying the longer 12-inch pipeline between "C" Structure and the inshore terminal was based upon environmental conditions along the route. Through the inland marsh, the pipeline

was laid in one continuous three-foot-deep dredged ditch which was backfilled. Under Cadro Pass and South Pass of the Mississippi River, the dredged ditch in which the pipeline was laid is three feet under Cadro's bottom soil and as deep as fifteen feet below the bottom of South Pass' channel. The entire ditch under Cadro Pass, and that part of the ditch on the side slopes of the South Pass crossing, was backfilled. In the Gulf, out to a point where the water is fifteen feet deep, the pipeline was laid in a continuation of the same three-foot-deep dredged ditch, which also was backfilled. For the rest of the distance to "C" Structure, the pipeline was laid below the mud-line surface of the Gulf bottom. However, except as noted hereinafter, it was not placed there by the dredged-trench method just described. It was coated with concrete until it weighed about 165 pounds per linear foot, and, in this condition, sheared into the Gulf's bottom soil as it was laid, and sank below the mud line under its own weight, obviating the necessity of dredging trenches. The pipeline emerges from the Gulf at the base of "C" platform and rises approximately 20 feet above the mud-line to a point where it was connected by Offshore, at an underwater flange, to a pipeline riser which Texaco built. Both the pipeline constructed by Offshore and the pipeline riser were clamped to the bracing of "C" platform. The riser comes up, extends across "C" platform, and then goes over the opposite side of that platform and back into the water, clamped to the platform's bracing, where it descends to another flange point about 20 feet above the bottom's mud line.

At that point the shorter 12-inch pipeline, which Offshore constructed and which runs between "C" Structure and "D" Structure, connects onto the terminal flange of Texaco's riser, proceeds downward, clamped to the platform bracing, to the Gulf bottom's mud line, penetrates under that mud line, bends, and then traverses the remaining distance to "D" Structure. There, this pipeline emerges from the Gulf bottom and comes out of the water as a riser itself, clamped to the bracing of "D" platform. That riser part of the pipeline then extends onto the lower deck of "D" platform where it is clamped and connects to Texaco's well heads through related devices located thereon.

Sections of both the longer and shorter 12-inch pipelines immediately adjacent to each side of "C" platform were buried in a ten-foot-deep dredged ditch extending several hundred feet out from the platform to afford initial fixity of the pipeline below the soil line in that vicinity.

The gathering system's 6-inch and 4-inch pipelines, running, respectively, between "B" and "A" platforms and "C" platform, emerge from the Gulf bottom and come out of the water as risers, clamped to the bracing of the various platforms, and extend onto the lower decks of the platforms where they are clamped. At "B" and "A" platforms these pipelines connect to Texaco's well heads through related devices located thereon.

The foregoing is depicted on Sketch "II."

The inshore terminal's platform, which is fixed to the bottom of Garden Island Bay, and the tanks, separators, treaters, pumps, routing lines, and other processing and transfer facilities located thereon, were constructed by Texaco. The inland end of the longer 12-inch pipeline emerges from the waters of Garden Island Bay and extends onto the inshore terminal's platform where it is clamped and connects to Texaco's devices mentioned above. A scraper trap, which "catches" metal scrapers that pass through the entire gathering system and clean the pipelines, was installed on the inshore terminal's platform by Offshore.

The fluids thus gathered from the offshore platforms go through separators at Garden Island Terminal where the gas is separated, measured, and disposed of. The remaining fluid then is moved to a treater where most of the water is separated from the oil. The removed water

is disposed of at this point. The thus processed oil is then moved to storage tanks. From those tanks, the oil is measured, pumped and then placed into an inland "common carrier" pipeline system for transportation to refinery or market points. Thus the product that subsequently is transmitted through the common carrier pipeline is an entirely different fluid than that which had come from beneath the ground, through the gathering system and into the terminal at Garden Island. It no longer contains water or gas, except in far smaller amounts that are removed from the crude at the refinery, and naturally, has a significantly decreased cubic content.

The production from the wells is pushed through the gathering system by the original internal earth's pressure to the inshore terminal. The pressure which moves the product from the Garden Island Bay Terminal through the common carrier pipeline is injected by pressure devices at the Garden Island Bay Terminal and is not the original pressure that pushes the fluids from inside the earth to the inshore terminal through the gathering system.

This pipeline gathering system was chosen by Texaco because it was the most practical, efficient, and economical way to move the crude oil from offshore to its inshore facility.

The work performed by Offshore under the prime contract is not confined to one particular locus. Part of the pipeline is physically located within the territorial limits of the State of Louisiana and part of it is located outside of Louisiana's recognized boundaries. This latter part—the large majority of the system—is on or under navigable water over the Outer Continental Shelf, over which only federal law governs.

Notwithstanding such hiatus, however, the Outer Continental Shelf Lands Act, 43 U.S.C. § 1331 et seq. (hereafter called OCS Act), reconciles the matter by selecting Louisiana's law as the federal law applicable to that portion of the gather-

ing system located on the Shelf. In pertinent part, OCS Act provides in § 1333(a) (1) that, "The Constitution and laws and civil and political jurisdiction of the United States are extended to the subsoil and seabed of the Outer Continental Shelf and to all artificial islands and fixed structures which may be erected thereon for the purpose of * * * transporting resources therefrom, to the same extent as if the Outer Continental Shelf were an area of exclusive Federal jurisdiction located within a State * * * " And in § 1333(a) (2) it provides that, "To the extent that they are applicable and not inconsistent with this subchapter or with other Federal laws and regulations of the Secretary now in effect or hereafter adopted, the civil and criminal laws of each adjacent State * * * are declared to be the law of the United States for that portion of the subsoil and seabed of the Outer Continental Shelf, and artificial islands and fixed structures erected thereon, which would be within the area of the State if its boundaries were extended seaward to the outer margin of the Outer Continental Shelf * * * All of such applicable laws shall be administered and enforced by the appropriate officers and courts of the United States. * * * * "

■ Where there is a conflict between what existing federal law already provides on a given subject, and what the law of the adjacent state provides on the same subject, the federal law prevails under the above provisions of the OCS Act.[3] It is only when there is no applicable federal law that the state law applies.

■ Inasmuch as there do not appear to be any "other Federal laws and regulations of the Secretary [of the Interior]" which are "inconsistent with" application of Louisiana's civil law in the instant case, that law will be used as the "Federal" law applicable to determining validity of lien claims arising out of that part of the oil-transporting pipe-

3. See Pure Oil Company v. Snipes, 293 F.2d 60 (5th Cir. 1961).

line that Offshore erected on the Outer Continental Shelf for Texaco. And, because Louisiana law would clearly in its own right apply to a determination of any such lien rights affecting the part of the pipeline which is physically located in Louisiana, the entire question of whether Offshore's furnishers have any valid lien rights against Texaco's gathering system, or rights against Continental's bond, is controlled by Louisiana law.

█ It is well settled in Louisiana that statutes creating privileges and liens are in derogation of common rights and must be construed *stricti juris*,[4] but this does not mean strained or unnatural construction. It means a fair, reasonable and natural interpretation by the ordinary rules for the construction of statutes with the cardinal object of ascertaining the intention of the legislature.[5] With these guide posts we proceed to a consideration of the lien statutes involved.

## LOUISIANA PRIVATE WORKS STATUTE

Continental and Texaco contend that the Louisiana Private Works Statute, LSA–R.S. 9:4801 et seq., has no application to the instant oil-gathering gathering pipeline on the theory that underground, underwater construction, as opposed to aboveground construction, is not within the scope of this statute. As authority for this proposition, counsel relies on H. R. Hayes Lumber Co. v. H. M. Jones Drilling Co., Inc., et al., 177 La. 626, 148 So. 899 (1933), which is the only Louisiana case to suggest that such a distinction was intended by the legislature. In *Hayes,* the Court cited Calatex Oil & Gas Co., Inc. v. Smith, et al., 175 La. 678, 144 So. 243 (1932), to support such a theory.

*Calatex* involved claims by unpaid laborers and materialmen against a general contractor and its surety in connection with the drilling of an oil well for plaintiff oil company, which instituted a concursus proceeding. The claimants contended that Act No. 298 of 1926 (an ancestor of the present Private Works Statute) applied and the contractor's surety argued that Act No. 232 of 1916 (the original Oil, Gas and Water Well Statute) controlled. The surety's reason for arguing the applicability of the 1916 Act was the further contention that, under that Act, recording an affidavit of lien and giving notice to the owner (which had not been done by the claimants) were essential prerequisites for recovery against the surety. The 1926 Act clearly contained no such requirements.

The Court held it was immaterial which Act applied, since the claimants were entitled to recover against the surety regardless of whether or not affidavits of lien were filed or notices served on the owner, because the language of both Acts, although stated somewhat differently, meant that the surety stood in the place of a defaulting contractor and could make no defenses unavailable to the contractor.

Thus, anything expressed in the *Calatex* opinion relative to the applicability, *vel non,* of the two Acts is *dictum.* The *dictum* for which *Calatex* was cited in the latter *Hayes* case concerned whether or not the 1926 Act had repealed the 1916 Act. It was argued by the claimants in *Calatex* that the 1916 Act had been repealed by implication because Section 11 of the 1926 Act referred to work caused to be erected by a mineral lessee. The Court said that Section 11 was inserted in the 1926 Act for the protection of laborers and materialmen who contribute to the building of structures and other improvements for persons other than the owners of the land. The Court noted that those who hold mineral leases frequently place structures or other improvements on the leased acreage in addition to drilling wells, and that it was the former type of construction to which Section 11 of the 1926 Act had appli-

---

4. McGee v. Missouri Valley Dredging Co., 182 So.2d 764 (1966), and cases cited therein.

5. Words and Phrases. "Strict Construction," Vol. 40, p. 453.

cation rather than the drilling of wells, so that, consequently, the 1916 Act still had vitality with respect to claims of laborers and materialmen who contributed to the drilling of wells. This was as far as the *dictum* in the *Calatex* case went, *viz,* a distinction between the drilling of a well and the building of structures and other improvements. No mention was made of aboveground *vis a vis* underground construction as a controlling criterion by which the applicability of the two lien statutes was to be determined.

*Hayes* involved a dispute between a mortgagee of a mineral lease and its equipment and a materialman, who furnished materials in connection with the drilling of a well under the lease, to the proceeds from a sheriff's sale of the mineral lease and equipment. The Court held that the mortgagee's claim was superior since the materialman's lien was not timely recorded under the provisions of Act 298 of 1926, the only Act (for reasons unimportant to this discussion) under which the materialman could derive any lien rights.

Although the primary issue turned on the holding that the materialman's lien rights were not timely perfected, the Court commented as follows:

> " * * * the [Private Works] Act of 1926 has no application, for [that] Act related only to constructions on top of the ground, whether on land leased or not leased, and does not, therefore, relate to the drilling of oil or gas wells, which, by their nature, are constructions made underground * * * "

The apparent purpose of the above comment was to justify exclusion from coverage under the lien statute of several small items furnished later and with respect to which the lien was timely filed. However, it would appear that the quoted language was a baseless conclusion drawn from *dictum* in the earlier *Calatex* case, and in any event its import is too vague and uncertain to warrant further consideration as valid authority.

The only opinion in which *Hayes* has been cited was that rendered by Judge Dawkins in Smith v. Anderson Bros. Corp., et al., 104 F.Supp. 117 (W.D.La. 1952). In this case defendant, a general contractor who had contracted to construct and lay a pipeline through several Louisiana parishes engaged plaintiff sub-contractor to clear and construct the right-of-way for the pipeline. Although the language from the opinion in *Hayes* was quoted by Judge Dawkins, the import thereof is difficult to discern since the case was decided on the theory that the clearing of a pipeline right-of-way was not work "in connection with the erection, construction, repair or improvement of any building, structure or immovable property," which quoted language is found in LSA–R.S. 9:4801. The pertinent question in the case should have been whether the entire project (constructing and laying a pipeline) was within the scope of the quoted statutory provisions, rather than whether a small portion of the project (clearing of the right-of-way) performed by one sub-contractor was covered by statute. Accordingly, the *Smith* case is of no value in deciding the instant case.

Thus, there is no basis in Louisiana jurisprudence to support the contention that merely because an oil-gathering pipeline lies, in the main, underground and underwater it is *per se* a construction without the scope of LSA–R.S. 9:4801 et seq.

The leading section of the Private Works Statute 9:4801, subd. A., spells out that the law is intended to apply to:

> " * * * the erection, construction, repair or improvement of any building, structure or other immovable property * * * "

Thus, it is important to examine the nature of the oil-gathering pipeline to determine if such an instrumentality, once constructed, is immovable property. Witnesses for Texaco and Continental attested to the fact that for most of its length the pipeline in question was firmly imbedded beneath the soil, having either

been laid into a trench, which trench was subsequently backfilled, or sunk below the water bottom of its own weight. It rises above the water at the four offshore well platforms and is securely fastened thereto. It also rises out of Garden Island Bay and runs for a certain length above the water level and onto Texaco's platform located in said Bay to which, again, it is securely fastened. Article 464 of the Louisiana Civil Code provides as follows:

> "Lands and buildings *or other constructions,* whether they have their foundations in the soil or not, are immovable by their nature." (Emphasis added)

Is the pipeline in the instant case "other construction" within the context of Civil Code Article 464? Considering the pipeline's degree of integration with the ground, and the permanent nature thereof (composed of steel and concrete, and already having lasted for over five years and undoubtedly being good for many more years), the pipeline can only be considered an immovable. The Louisiana jurisprudence, in construing Article 464, indicates that "other construction" is not to be limited to structures essentially similar to buildings. Thus, in Industrial Outdoor Displays v. Reuter, et al., 162 So.2d 160 (La.App. 1964), it was held that a commercial advertising display sign fell within the category of "other construction" within the meaning of Article 464. The Court commented:

> " * * * It is certainly a 'construction' and is firmly imbedded in the ground and is as permanent a construction as can be made of steel and concrete. It is already ten years old and is probably good for several decades more.

> "In our opinion the sign structure is an immovable by nature, and after a careful search of the jurisprudence we have found no decision which would tend to alter our views. The structure is either an immovable by nature

or it is a movable. We cannot hold that it is the latter." 162 So.2d at 164.

There are no cases holding that a construction, which otherwise fits the definition of immovable property, must be considered movable property simply because the major portion thereof lies underground. Likewise there is no logic to a rule that the Private Works Statute applies to the construction of immovable property, with the exception of that immovable property which, in the main, lies underground. Such a rule would have the effect of denying application of the Private Works Statute to such common underground constructions as swimming pools, building foundations, underground transit systems, disaster shelters, tunnels and the like.

Even if we assume Texaco's interpretation of the statute is correct, we note that portions of Offshore's work were *not* underground. As noted, some pipe installations came out of the water at the offshore platform and at the Garden Island Bay facility and were securely connected to these aboveground installations. May it not be logically concluded that since a portion of the facility was constructed aboveground, the entire project is therefore afforded coverage by the statute? Would this not be more in accord with the legislative intent than a contrary holding that since only a small portion was aboveground coverage is not afforded? This would require the Courts to determine how much aboveground construction would be required before the statute would apply.

It is worthy of note that the jurisprudence under other Articles of the Louisiana Civil Code that contain the term "building" recognizes no distinction between aboveground and below construction. For example, Article 2762 of the Civil Code governs liability for the design or construction of a defective "building." In the case of Murphy Corporation v. Petrochem Maintenance, Inc., et al, 180 So.2d 716 (La.App.1965), writ ref. 248 La. 910, 182 So.2d 662, Article 2762 was specifically held applicable to

an underground gasoline storage tank, citing an earlier case which had applied the Article to a contract to extend and correct deficiencies in a sewer system. The Court rejected defendants' argument that the Article applied only to building construction related to the erection of structures, as opposed to the installation of *underground* gasoline storage tanks.

Even if it were true that the contract performed by Offshore did not amount to "erection (or) construction * * * of any * * * structure or other immovable property," within the meaning of the Private Works Statute, it does constitute *"improvement* of (a) building, structure or other immovable property," (Emphasis added) which is a second category of construction to which the Private Works Statute applies. It was apparent from the testimony of Mr. Tom Broaddus Price, Assistant District Superintendent of the Harvey Division of Texaco, particularly on cross-examination, that the oil-gathering pipeline installed by Offshore and the Garden Island Bay Terminal facilities, constructed by another contractor, together, and only together, solved Texaco's problem of gathering the material produced from its wells in blocks 37 and 38, processing such material to a certain degree, and injecting the residual crude oil into the common carrier line having a terminal in Garden Island Bay. There were other means of achieving the desired results, but the combination of an oil gathering pipeline and processing and storage facilities located in Garden Island Bay was the method selected by Texaco, because as we have said, it represented the most economical solution. Mr. Price testified that construction of the oil gathering pipeline and the Garden Island Bay facilities were conducted simultaneously.

On the strength of the photographs of the Garden Island Bay facilities and Mr. Price's testimony that these facilities were constructed on wooden piling anchored to the water bottom through the weight of a concrete slab, it cannot be doubted that the Garden Island Bay platform and the facilities located thereon are immovable property. LSA–C.C. Art. 464. The evidence also established that the purpose of the facilities at Garden Island Bay were to preliminarily process and store the material produced from the wells in blocks 37 and 38 after receiving such material following its flow from "A", "B", "C" and "D" Structures through the pipeline installed by Offshore. Accordingly, it is apparent that, were it not for the existence of the oil-gathering pipeline, or some other means of getting the material produced from the wells to the Garden Island Bay Terminal, the facilities located in Garden Island Bay for processing and storing production from blocks 37 and 38 would be of no value to Texaco and, of course, never would have been built. Thus, the conclusion is imperative that if immovable property (Texaco's Garden Island Bay facilities) is valueless without certain other construction (the oil-gathering pipeline), such "other construction" constituted *"improvement of* (a) building, structure or other immovable property," (Emphasis added), and the fact that such "other construction" happens to be principally underground and underwater is of no moment.

For purposes of determining the applicability of the Private Works Statute, the pipeline in question, then has two distinct qualities. Considered alone, it is a large pipe principally imbedded beneath the ground and water bottom. Viewed in the context of its purpose, it vitally improves other Texaco property located aboveground. While the contention can be made the *dictum* in the *Hayes* opinion restricts application of those provisions of the Private Works Statute which relate solely to erection or construction of structures or other immovable property to aboveground construction, such limitation has no relevance to those other provisions of the Statute which relate to construction, wherever located, which *also* improves related aboveground immovable property. This

is so because the significant question anent this separate coverage afforded by the Statute is the purpose served by the construction and not its physical location. To illustrate this reasoning, it would be illogical to contend that a pedestrian tunnel, designed to connect two office buildings would not be covered by the statute, although an elevated pedestrian walkway constructed to achieve the same purpose would be covered.

■ I hold, therefore, that the instant pipeline clearly falls within both categories of constructions covered by the Private Works Statute.

## LIABILITY OF CONTINENTAL AS SURETY ON OFF-SHORE'S BOND

Paragraph 19 of the General Contract between Texaco and Offshore Gathering Corporation (P–1) provides:

"19. *SURETY BOND:*

Upon execution of this contract, Contractor will be required to execute a surety bond in amount equal to 100% of the estimated total contract price *to guarantee the completion of all work within the time provided and the fulfillment of all obligations under this contract arising either directly or indirectly,* including but not limited to, the defense of all litigation incident thereto in which TEXACO is made a party or co-defendant. The surety company shall be designated by TEXACO and the premiums shall be paid by TEXACO." (Emphasis added).

Paragraph 12 of the General Contract provides:

"12. *LIENS:*

a. Contractor shall indemnify and save TEXACO harmless from all claims, demands, causes of action or suits of whatever nature arising out of the services, labor and materials furnished by contractor or its sub-contractors under this contract.

b. Contractor shall promptly and satisfactorily settle all claims for labor performed and supplies or materials furnished in connection with such work, and in event Contractor fails or refuses to promptly and satisfactorily settle any such claims, TEXACO, shall after so notifying Contractor in writing, have the right to settle such claims for account of Contractor, and deduct the amount thereof from the contract price, or TEXACO shall have the right to hold all sums due or to become due Contractor, without interest, until satisfactory evidence is furnished to it that all claims *and liens have been settled and released.*" (Emphasis added).

It is significant to note that Texaco undoubtedly believed it would have liability exposure under one of the lien statutes when the general contract was drafted, for there is no other reasonable explanation for the protective provisions in subparagraph b of paragraph 12, entitled "LIENS," granting Texaco certain rights in the event Offshore did not pay all claims for labor and materials and *settle and cause the release of all liens.*

Moreover, from correspondence originating with Texaco it is obvious that Texaco construed the above provisions of the General Contract such that the bond upon which Continental was surety should be responsive to the claims of third party subcontractors and materialmen. For example, by letter dated April 19, 1962 to Continental and Offshore (VT–21), Texaco, after stating that numerous demands had been made upon Texaco by laborers and materialmen and that certain claimants had threatened to file liens, advised:

"In connection with the above, it is the posititon of Texaco that the primary obligation of satisfying these current claims and demands and any others that may arise, as well as the full performance and satisfaction of all other obligations under the subject contract rest entirely with the Off-

shore Gathering Corporation and its surety, Continental Casualty Company. Accordingly, Texaco, Inc. demands that all outstanding and future claims for labor and services performed, equipment rented, supplies or materials furnished or any other matter arising in connection with the above captioned contract be promptly and satisfactorily settled by Offshore Gathering Corporation and Continental Casualty Company."

This construction of the responsibility of the principal and surety under the bond was again stated by Texaco in a letter dated May 17, 1962 to Mr. Diaz (Counsel for United) (P–78), wherein it was stated:

"Texaco's position has been and still is that it is the responsibility of Offshore and its surety to fully perform and satisfy all obligations of the subject contract and to fully protect, indemnify and save Texaco harmless from any liability whatsoever arising out of the services, labor, materials and equipment furnished under the contract referred to hereinabove."

It is clear, therefore, that it was the intention of Texaco to exact of Offshore the bond required by LSA–R.S. 9:4802, and, since the bond was executed by Offshore and Continental in the light of the above quoted provisions of the General Contract, it was the evident intention of the contractor and surety to give such a bond. See Minden Presbyterian Church v. Lambert, et al, 167 La. 712, 120 So. 61 (1929). Thus, the provisions of LSA–R.S. 9:4803 and 9:4806 must be read into the bond. See Electrical Supply v. Eugene Freeman, Inc., et al, 178 La. 741, 152 So. 510 (1934), and cases cited therein.

The pertinent portions of these sections of the Private Works Statute read as follows:

9:4803: "Subject to the limitation provided in R.S. 9:4814, where the owner has required the bond herein provided, the surety thereon shall be liable in solido with the contractor for all labor and materials used in the said work of improvements * * * as to which labor and material the said surety shall be bound to the same extent as the said contractor, undertaker, master mechanic or engineer, or other person undertaking the work."

9:4806: "* * * Subject to the limitation provided in R.S. 9:4814, in all cases where surety has been furnished as between such surety and any claimant for labor or material or any sub-contractor, journeyman, cartmen, truckmen, or mechanic, the surety shall be entitled to make only the same defense as the contractor for whom he signed as surety is authorized to make * * *"

There is little question, therefore, that Continental is liable to those creditors who have claims of a nature covered by the Private Works Statute, even though they have not recorded a lien. Bell v. Lieber, 169 La. 731, 125 So. 871 (1930).

## LOUISIANA OIL, GAS AND WATER WELL STATUTE

Continental and Texaco contend that the Louisiana Oil Well Statute, LSA–R.S. 9:4861 et seq., is not applicable to the instant oil gathering pipeline principally on the theory that labor and services relative to such construction were not performed "* * * in connection with the operation of any oil, * * * well or wells * * *," which language is found in R.S. 9:4861. In support of this position, counsel relies on McGee v. Missouri Valley Dredging Co., et al, 182 So.2d 764 (La.App.1966), the testimony of Texaco's employee-experts that the industry does not consider such a pipeline to be "in connection with the operation of * * * [a] well," and the argument that there would be no limits to lien rights if the Oil Well Statute were held applicable to the construction of such a pipeline.

Texaco's employee-expert witnesses, Messrs. Price and Gibbens, (James

Harvey Gibbens, Assistant to the Executive Vice-President of Texaco in Houston), testified with conviction that no device situated or operation taking place "downstream" of the well head is considered by the oil industry to be "in connection with the operation of a well." However, such expert testimony is of little value since the witnesses did not explain why, or the context within which, the industry customarily has considered the quoted phrase, and what significance the concept of what is and what is not in connection with the operation of the well has within the industry. Thus the opinions given by these expert witnesses cannot be accorded any weight.

*McGee* is the only case in Louisiana jurisprudence dealing with the applicability of the Oil Well Statute to a pipeline and provides a clear rule for determining the scope of coverage afforded by the statute. Accordingly, a study of *McGee* is essential. The plaintiff, a surveyor, was hired by a prime contractor to perform surveying services in connection with the construction of a natural gas transmission pipeline. Not having received payment for his surveying services, plaintiff filed an affidavit in order to preserve his lien, stating therein that he was asserting a lien and privilege under R.S. 9:4861 et seq. The contractor subsequently posted a surety bond, and the lien inscription was cancelled. Plaintiff then filed suit against the contractor and the owner of the pipeline, attempting to sequester the pipeline by virtue of his lien.

In rejecting plaintiff's demand, the Court of Appeals for the First Circuit stated:

"We find that R.S. 9:4861 et seq., does not cover nor was it intended to cover a situation such as presented herein. It would be an unwarranted extension of the provisions of the statute to hold that a person who performs service in *the construction of a 24 inch or 30 inch gas transmission pipeline* has a lien under the provisions of this statute." (Emphasis added). 182 So.2d at p. 768.

However, prior to enunciating this finding, the Court made the folowing observation:

"It is obvious that a 24 inch and a 30 inch pipeline are a transmission line. There is no allegation or proof in this record that the pipelines are a part of the gathering system of producing gas wells." 182 So.2d at p. 767.

The clear import of such observation by the Court is that a distinction must be drawn between a gas transmission or common carrier line and a pipeline that is part of a gathering system that operates in conjunction with specific producing wells.

The reason for and significance of such a distinction is gained from an analysis of the Court's reasoning. The Court obviously was of the opinion that the scope of the statute should be limited to work directly related to that property upon which the statute grants a privilege, viz. drilling rigs, standard rigs, machinery, appurtenances, appliances, equipment, buildings, tanks, and other structures attached to the foregoing, and other structures located on the leased acreage, as well as the wells themselves, the mineral lease, the minerals produced and the proceeds thereof inuring to the working interest.

Since the Court determined as a factual matter that the gas transmission line in question in *McGee* was not attached to the wells from which the gas transmitted through the pipeline originated, nor was it attached to any drilling rigs, etc., nor was it located on the leased acreage on which the wells were located, it concluded that the line was without the scope of R.S. 9:4861 et seq.

It would appear that the Court's reasoning was sound and provides a logical basis for limiting the scope of the statute while at the same time giving it sufficiently broad application so as not to frustrate the apparent liberal legislative intent.

Applying this test to the facts of the instant case, it is apparent that the oil gathering pipeline in question is within the purview of R.S. 9:4861 et seq., for the pipeline here is attached to "structures located on the leased acreage," viz. "A," "B," "C" and "D" Structures.

Further, we should consider the effect of other facts peculiar to an oil gathering system. The movement of the oil, gas and water from the ocean floor to the storage tanks at Garden Island Bay is one continuous operation, regardless of the valves and fittings Texaco placed on the line. The pressure at the bottom of the hole forces the fluids up through the tubing to the Christmas tree, through certain metering and testing devices on the platforms, through the pipeline in question, to separator, treaters and storage tanks on shore. It is only when the fluids arrive at the Garden Island Bay terminal, and after the gas is flared and the water is dropped out, that the movement stops and the oil is stored. The movement from the bottom of the well to the tanks on shore is continuous.

Texaco and Continental insist that the pipeline in this case should not be considered as being in connection with the operation of the wells on "A", "B", "C" and "D" Structures because the pipeline is not the only method which Texaco could use to transport its production from the offshore well locations to the terminal facility. But regardless of whether the pipeline is the only available method or not, it is the method that was used, and without some method of transporting production the wells could not be commercially operable. Of course, Texaco could begin to barge the oil away, but then the barges would be used in connection with the operation of the well. The statute recognizes this, and it gives a lien to "[a]ny person who does any * * * barging * * * in connection with the operation of any oil * * * well or wells * * *" (R.S. 9:4861).

In a workman's compensation case decided in the Second Circuit Court of Appeal for Louisiana in 1927, Jackson v. Young, 6 La.App. 854, a workman injured in the construction of a pipeline sought recovery under the Workmen's Compensation Statute then in force. The workman could not have recovered unless the corporation by which he was employed was engaged in the operation of gas wells. The Court pointed out:

"It goes without saying that no gas well could be operated as a commercial proposition without a gas pipe line connecting that well to the point of delivery of the gas."

"A gas well without a pipe line cannot be operated as a commercial well, for without such pipe line that well must either lay dormant or blow its gas into the open air; we therefore think that the operation of a gas pipe line is the putting in operation a gas well and it comes under the statute irrespective of who owns the gas well." 6 La.App. 854 at 856–57

The Court continued as follows:

"We have had numerous cases under the compensation law against pipe line companies. For instance, the Standard Pipe Line Company and the Shreveport Eldorado Pipe Line Company, neither of which owned any oil wells, and in none of those cases has there been any contention but that they fall under the operation of the compensation law. It remained for ingenious counsel in this case to raise the point, but as *we think that the transportating* [sic] *of gas through pipe lines is a necessary part of the operation of gas wells,* that such business comes under the statute." (Emphasis supplied) 6 La.App. 854 at 857.

■ The Louisiana Oil Well Statute clearly covers the work here performed by Offshore.

## VALIDITY OF ALLEGED ASSIGNMENT AND/OR TEXACO'S ALLEGED INDEPENDENT AGREEMENT TO PAY UNITED AND JORDAN

United and Jordan claim that Texaco obligated itself to pay certain sums to

them out of money withheld from Offshore and that this promise by Texaco was made to induce them to leave their barges and tugboats on the job. United and Jordan further contend that Offshore made valid assignments to them out of the funds retained by Texaco.

Since the job being performed by Offshore for Texaco was a pipe laying project, barges and tugboats were indispensible. When Offshore failed in its payments for barge and tugboat rental, United and Jordan threatened to remove their equipment from the job and Texaco met with United and Jordan officials separately to find a solution. With Texaco, time was of the essence.

At the trial, the testimony was in conflict over the content of those discussions, and the agreements finally consummated. A review of all that testimony will serve no useful purpose. Suffice it to say, Texaco officials did unequivocably promise United and Jordan that if they would let their equipment remain on the job, Texaco would see to it that United and Jordan were paid out of the large retainage Texaco then had in its possession, which was due Offshore.

There is other evidence that Offshore attempted to assign a portion of this money to United and Jordan. These alleged assignments were not properly consummated because Texaco's written consent was necessary under the prime contract and it was never forthcoming.

■ At the outset, Texaco objected to the admission of any parol evidence to prove the alleged assignments and Texaco's alleged promise to pay Offshore's debts on the grounds that Louisiana Civil Code Article 2278(3) prohibits such testimony. That Article says in part:

"Parol evidence shall not be received
* * *
(3) To prove any promise to pay the debt of a third person."

The courts of Louisiana have developed an exception to this general rule to the effect that parol evidence is competent to prove an agreement to pay the debt of another by one activated by pecuniary interest in making the agreement.[6] The Louisiana Supreme Court in Fabacher v. Crampes, 166 La. 397, 117 So. 439 (1928), put it a little differently in a case almost on all fours with the instant case.

"The prohibition against the admission of parol evidence to prove a promise to pay the debt of another, does not apply (1) when the promise is made, upon adequate consideration, to the debtor himself, or (2) when the promise, even though made *to the creditor,* is given with the consent of the debtor, and the promisor has in his hands, or afterwards receives, money or property belonging to the debtor, to be applied to the debt. For in both of these cases it is an original and direct undertaking by the promisor towards the debtor himself, and not at all a collateral undertaking to pay the debt of another."

This contractual exception to the parol evidence rule is supported by Corbin on Contracts, Vol. 2, p. 263, et seq. On p. 264, I quote:

"Because of the financial irresponsibility of B (Offshore), A (United and Jordan) refuses to do the work or to deliver the material necessary for the work of construction desired by C (Texaco). In order to induce performance by A (United, Jordan), C (Texaco) promises him that he will see

6. Wallemburg v. Kerry, 16 La.App. 221, 133 So. 823 (2nd Cir. La., 1931); Collier v. Brown, 141 So. 405, 11 La.App. 567 (2nd Cir. La., 1922); Gardiner v. Cleveland Motors, Inc., 16 So.2d 544 (Ct. of App.1st Cir. La., 1944); Custom Contract Co. v. Nims, 145 So.2d 374 (Ct. of App.4th Cir. La., 1962); Flick v. Salloum, 163 So.2d 143 (Ct. of App.4th Cir. La., 1964); Fuselier v. Hudson, 93 So.2d 266 (Ct. of App.1st Cir. La., 1957).

him paid the amount due from B (Offshore) out of sums to become due to B (Offshore) from the promisor C (Texaco) as the contract work progresses. Such a promise is nearly always held not to be within the statute of frauds (2278 (3)) even though it is a promise to a creditor of a third person and even though the promised performance will extinguish that third person's debt to the promisee."

Corbin goes on to say that this becomes a personal liability of C (Texaco) because he made his promise to A (United and Jordan) for a consideration so directly beneficial to the defendant himself as to make him an original debtor.

The United States Supreme Court in a case involving a similar rule in Nebraska said:

"Whenever the main purpose and object of the promisor is not to answer for another, but to subserve some pecuniary or business purpose of his own * * * his promise is not within the statute, although it may be in form a promise to pay the debt of another."

A different result might be called for in the event the promise to pay by Texaco had been conditioned on Offshore's *failure* to pay.[7] In the instant case, Texaco's assurance was that United and Jordan *would* be paid out of the retainage. There was no evidence that Texaco promised to pay if Offshore did not pay. Texaco said in effect—Don't worry about your bill; we have enough retainage to cover it. You will be paid in full from these funds. There was no evidence that Texaco entertained any hope of Offshore paying its obligations.

Therefore, there was an unconditional promise by Texaco to pay United and Jordan, independent of the retaining funds, and I so hold.

---

7. Watson Bros. v. Jones, 125 La. 249, 51 So. 187 (1910); Brown & Root, Inc. v. Gifford-Hill & Co., 319 F.2d 65 (5th Cir., 1963); Nat'l Materials Co. v. Guest, 147 So. 771 (Ct. of App. La.1933).