CONTINENTAL CASUALTY COMPANY et al., Plaintiffs-Appellants-Cross Appellees,

v.

ASSOCIATED PIPE & SUPPLY CO., Inc., et al., Defendants,

Thomas Jordan, Inc., Defendant-Appellee-Cross Appellant.

TEXACO, INC., Plaintiff-Appellee-Cross Appellant,

v.

ASSOCIATED PIPE & SUPPLY CO., Inc., et al., Defendants,

Thomas Jordan, Inc., Defendant-Appellant-Cross Appellee.

UNITED TUGS, INC., Plaintiff-Appellant-Cross Appellee,

v.

CONTINENTAL CASUALTY COMPANY et al., Defendants-Appellees-Cross Appellants.

No. 29157.

United States Court of Appeals, Fifth Circuit.

July 29, 1971.

Rehearing Denied Oct. 18, 1971.

Lawrence K. Benson, Jr., Milling, Saal, Benson, Woodward & Hillyer, New Orleans, La., for Associated Pipe and Supply Co., Inc., and Thomas Jordan, Inc.

. A. Morgan Brian, Jr., Deutsch, Kerrigan & Stiles, New Orleans, La., for appellants; R. Emmett Kerrigan, Wiley G. Lastrapes, Daniel P. Hurley, New Orleans, La., of counsel.

Peter H. Beer, Daniel P. Hurley, Wiley G. Lestrapes, Richard Jurisich, E. Howard McCaleb, John M. Page, J. William Vaudry, Jr., New Orleans, La., Warren Rush, Bean & Bush, Lafayette, La., Joseph E. Friend, Emile Turner, New Orleans, La., Edward T. Diaz, Golden Meadow, La., Charles J. Hanemann, Jr., of O'Neal, Waitz & Henderson, Houma, La., A. D. Freeman, Robert E. Winn, Cicero C. Sessions, Richard L. Bodet, Walter M. Babst, New Orleans, La., for appellees.

Before RIVES, AINSWORTH and MORGAN, Circuit Judges.

RIVES, Circuit Judge:

This case comes to the federal courts by virtue of the federal jurisdiction over the outer continental shelf. Just under a decade ago, Texaco, Inc. (Texaco) entered into a contract with Offshore Gathering Corporation (Offshore) calling for Offshore to construct a pipeline to a Texaco oil and gas field off the coast of Louisiana. Offshore completed the construction and it was accepted by Texaco May 28, 1962.

Unfortunately, Offshore left unpaid numerous parties who had provided labor, material, equipment and services. Legal actions were soon initiated, an interpleader filed by Texaco, an interpleader filed by Offshore's surety, Continental Casualty Company (Continental), and several personal actions were consolidated in the district court for trial. Nearly seventy claimants were involved.

A bifurcated trial was held, dividing the issues, generally, into questions of law and factual issues on the merits of each claim. District Judge Fred T. Cassibry wrote two opinions, 279 F.Supp. 490; 310 F.Supp. 1207, which discuss the legal issues at length.

Because the Outer Continental Shelf Lands Act, 43 U.S.C. § 1331 et seq., makes the state law of Louisiana applicable in this case, the federal courts are presented with the task of resolving a great many issues of state law. We are in accord with Judge Cassibry's sentiments stated in a footnote in his second opinion:

"This case is replete with complex state law problems, concerning which Louisiana Courts have had little op-

portunity to address themselves. If this suit finds its way to the Court of Appeals, I am sure they will become keenly aware of the need for a certification procedure by which the Louisiana Supreme Court could determine these knotty legal issues."

310 F.Supp. 1216, 1217.

We will discuss the issues presented in the following order:

I. Whether the pipeline is a type of structure contemplated by and within the scope of the Louisiana Private Works Statute, L.S.A.–R.S. 9:4801, *et seq.*

II. Whether the bond given by Continental is a statutory one as contemplated by the Private Works Statute, L.S.A.–R.S. 9:4801, *et seq.* (particularly § 9:4802).

III. Whether the pipeline is a type of construction contemplated by and within the scope of the Louisiana Oil Well Lien Statute, L.S.A.–R.S. 9:4861 *et seq.*

IV. Whether recordation is essential to the enforceability of the lien created by the Oil Well Statute, L.S.A.–R.S. 9:4861, *et seq.*

V. Whether crewboat services create liens under the Oil Well Statute, L.S.A.–R.S. 9:4861, *et seq.*

VI. Whether catering and housekeeping services create liens under the Oil Well Statute, L.S.A.–R.S. 9:4861, *et seq.*

VII. Whether manned equipment rentals are covered by a bond under Private Works Act, L.S.A.–R.S. 9:4801, *et seq.*

VIII. Whether claimant United Tugs, Inc., is a subcontractor or mere renter of equipment.

IX. Whether Texaco is liable for claims of United Tugs, Inc., and Thomas Jordan, Inc., by virtue of representations made to them or by assignments of the contract funds executed by Offshore.

X. Whether the judgment awarding Ellzey Marine Supplies 25 per cent of its claim was correct.

XI. Whether the judgment holding that Golden Meadow Oil Company, Inc., had failed to prove its claim was correct.

XII. Whether Texaco was correct in deducting amounts owed it by Offshore from the contract funds it retained and deposited in the registry of the court pursuant to its interpleader.

XIII. Whether the 10 per cent attorney's fees provided for by the Oil Well Statute, L.S.A.–R.S. 9:4861, should be calculated on the original debt or the original debt plus interest.

XIV. Whether successful claimants are entitled to have their judgments increased by virtue of Act No. 315 of 1970, Louisiana session laws, which increased the rate of legal interest.

A brief physical description of the pipeline is required here.[1] Four offshore well sites are involved. Pipelines were constructed leading directly from each of three sites to the fourth site, and from this site leading inland to a plant called the Garden Island Bay facility. Thus the fluid product of the wells, a combination of oil, gas and water, was transported inland through this system. As aptly described by one of the parties, it resembled roughly "a long leg with a three-toed foot at its end."

The system, some ten miles in length, was embedded in the Gulf bottom, emerging up into and above the water only where it connected to the well sites and inland facility. The fluids move from the bottom of the wells to the inland facility by the original pressure from the wells. Some metering is done at the central well site, but no separating or any-

---

1. A detailed description is found in the district court's original opinion. 279 F.Supp. 490, at 493–495.

thing which could be termed "processing" is done until the fluids reach the inland facility.

At the inland facility, the first permanent separation of oil, gas and water occurs, and oil is moved on in the system through a common carrier pipeline by pressure injected by devices located there.

## I. *Applicability of Louisiana Private Works Statute.*

The Private Works Act, La.Rev.Stats. 9:4801[2] establishes a lien for those who provide labor, materials, machinery, or fixtures, exclusive of those who rent or lease out movable property, "for the erection, construction, repair or improvement of immovable property," as well as for those who provide materials or supplies "for use in machines used in or in connection with the erection, construction, repair or improvement of any building, structure or other immovable property." On its face, the statute would seem to cover the pipeline here, whether it is considered a "structure" or an "improvement." A question of the statute's applicability is presented, however, by language used in two Louisiana cases, Calatex Oil & Gas Co. v. Smith, 1932, 175 La. 678, 144 So. 243, and Hayes Lumber Co. v. H. M. Jones Drilling Co., 1933, 177 La. 626, 148 So. 899, which at least provide a basis for the argument that the Private Works Act applies only to structures located above ground.

These cases were studied in depth by the district court, and little can be added

to the well-reasoned treatment of them below. However, since their interpretation is critical to this issue of this litigation, and since the appellees feel that the district court overstepped its bounds in construing state law, further discussion is required.

In *Calatex* a contractor who drilled an oil or gas well failed to pay claims for labor and materials. The claimants asserted liens under a 1926 Public Works Act which did not require filing of liens. The surety of the contractor asserted that the only applicable statute was the 1916 Oil Well Lien Statute,[3] which did require filing and notice to the owner. The state court held that it made no difference which statute applied, since language in both statutes placed the surety in the shoes of the contractor, and neither statute required notice or filing to secure claims against the contractor (as opposed to the owner). The court went on to hold, what the district court below considered dictum, that the 1926 statute dealing with private works did not repeal the 1916 oil well lien statute.

The court in *Calatex, supra,* held that the 1916 Oil Well Lien Act protected those who aided in the construction of oil, gas and water wells, but did not protect those who contributed to buildings and other improvements on a *leased* well site. It felt that the 1926 Public Works Act sought to protect this latter class of persons, stating:

"It is therefore clear enough that this section of the act has no refer-

2. "§ 4801. *Privilege on Immovables for labor and materials; rank*

"A. Every contractor, sub-contractor, architect, engineer, master-mechanic, mechanic, cartman, truckman, workman, laborer or furnisher of material, machinery or fixtures, exclusive of anyone who rents or leases movable property, who performs work or furnishes material for the erection, construction, repair or improvement of immovable property, or who furnishes material or supplies for use in machines used in or in connection with the erection, construction, repair or improvement of any building, structure or other immov-

able property, with the consent or at the request of the owner thereof, or his authorized agent or representative, or of any person with whom the owner has contracted for such work, has a privilege for the payment in principal and interest of such work or labor performed, or the materials, machinery or fixtures furnished, and for the cost of recording such privilege, upon the land and improvements on which the work or labor has been done, or the materials, machinery or fixtures furnished."

3. Act No. 232 of 1916, La.

ence to liens and privileges against oil, gas, or water wells drilled on leased premises, but relates only to liens and privileges against such buildings or improvements as the lessee may erect on the leased premises."

144 So. 243, 245.

*Hayes Lumber Co., supra* is the real basis for appellants' argument that the pipeline is not covered by § 9:4801 because it is located beneath the surface of land and water. The plaintiff in *Hayes* had supplied materials for the drilling of a well and repair thereto. The legal dispute was between the supplier and the mortgagee of the well site leasehold as to which had priority for the proceeds from a sheriff's sale of the lease and materials. The part of the court's opinion which gives rise to the instant controversy is as follows:

> "The only act pertinent to the privilege, asserted by plaintiff, is Act No. 298 of 1926, pertaining to the construction, repair, and improvement of buildings and works on immovable property. There are even items in plaintiff's account to which the act of 1926 has no application, for the act relates only to constructions on top of the ground, whether upon land leased or not leased, and does not, therefore, relate to the drilling of oil and gas wells, which, by their nature, are constructions made underground. Calatex Oil & Gas Co. v. Smith, 175 La. 678, 144 So. 243."

*Hayes,* 148 So. 899, 900.

■ Texaco argues that lien statutes should be strictly construed and that the application of § 9:4801 is unequivocally foreclosed by the above-quoted language in *Hayes.* But we are bound not to do damage to statutory language, and for this reason *Hayes* and *Calatex* must be scrutinized carefully to determine their meaning.

Texaco concedes that *Hayes* was dealing with an oil well. All that was need-

ed for the opinion, therefore, was to hold that the Private Works Act did not apply to oil wells. But the court phrased its holding to state that the Private Works Act did not apply to any underground structures. Giving every possible presumption to the soundness of this language, we can find nothing in the statutory history or other case reports to support this broad language except the case it cites, *Calatex.*

*Calatex* also involved a well, and the broadest scope of its language, whether dictum or not, held only that the Public Works Act did not apply to wells. As the district court below noted, the above-below ground dichotomy is not a child of *Calatex,* but solely of *Hayes.*

Looking solely at the language of § 9:4801, we would have difficulty adhering to the view that wells were not encompassed within its scope were it not for the specific holdings of the Louisiana courts. These holdings are based on the sound reasoning that wells are specifically covered by a separate statute and the coverage of wells is not preempted by the Private Works Act. There is no similar reason to withdraw all underground immovable property from the Private Works Act.

■ For this reason we adhere to the district court's holding that *Hayes* must be read as meaning no more than what was necessary for it to decide, and this, shown by its reliance on *Calatex,* is limited to holding that the Private Works Act does not apply to oil wells.

■ The Louisiana Supreme Court, we recognize, is the final interpreter of the meaning of Louisiana statutes. Where the broad language of a state court would apparently do damage to the plain meaning of that state's statute, the language of the case report must be examined carefully. In holding as we do, we do no violence to the express holding of *Hayes*—that oil wells are not covered by the Private Works Act.[4]

---

4. The district court placed its decision on a dual basis, holding that § 9:4801 covered the pipeline as an improvement to an above-ground structure—the Garden Island Bay facility.

Even if the state legislature had excluded below-ground structures from § 9:4801, an argument which we reject, we can conceive of no rational argument for drawing the statute's boundaries in all cases at the level of the surrounding soil. To accept Texaco's argument would be to exclude foundations, pilings and cellars from the statute's coverage, while including the buildings which they support.

## II. *Liability of Continental Casualty Company on Its Bond.*

The question is presented as to whether Continental's bond is statutory or conventional; if it is statutory Continental is personally liable to some of the claimants. The applicable statute, calling for the recordation of building contracts, the bond which the owner may require of the contractor, and the recordation of the bond is set out in the margin.[5]

Offshore procured from Continental the bond in the amount of $397,000.00, naming Texaco as the obligee. A rider increased the amount by $45,000.00.

■ Several questions arise. First, can the bond be statutory even though furnishers and suppliers are not named

---

Texaco argues that it would be inconsistent to hold that an underground structure is excluded from the coverage of § 9:4801, and then to hold it within the statute's protection as an improvement. We find this argument without merit.

5. "§ 4802. *Contracts to be recorded; bond; time for filing privileges; cancellation of entries*

"Every contract hereafter entered into for the repair, reconstruction, erection, construction, or improvement of any work on immovable property by any undertaker, general contractor, master mechanic, or engineer, or other person undertaking such general contract with the owner or his authorized agent or representatives, shall be reduced to writing, signed by the parties thereto by an authentic act, or under private signature, and shall be recorded in the office of the clerk of court or the recorder of mortgages of the parish wherein said work is to be executed, before the date fixed on which the work is to commence and not more than thirty days after the date of the said contract. Such recordation shall preserve the privileges on the building or other work of improvement, and on the land on which it is situated, in favor of every undertaker, architect, consulting engineer, contractor, master mechanic, or contracting engineer, and all sub-contractors, workmen, journeymen, cartmen, truckmen, laborers, mechanics, or furnishers of material, machinery, or fixtures as their interest may arise. The owner of such work shall require of such undertaker, contractor, master mechanic, or engineer, a bond with surety as follows: For all contracts not exceeding ten thousand dollars the amount of the bond shall be the amount of the contract. If the contract is over ten thousand dollars, but does not exceed one hundred thousand dollars, the bond shall be not less than fifty per cent of the amount of the contract but not less than ten thousand dollars in any event, if the contract is over one hundred thousand dollars but does not exceed one million dollars, the bond shall be not less than thirty-three and one-third per cent of the amount of the contract; and if the contract exceeds one million dollars, the bond shall be not less than twenty-five per cent of the amount of the contract. The bond shall be attached to and recorded with the contract in the office of the clerk of court or recorder of mortgages, as above set forth, and the condition of the bond shall be the true and faithful performance of the contract and the payment of all subcontractors, journeymen, cartmen, workmen, laborers, mechanics, and furnishers of material, machinery, or fixtures jointly as their interest may arise. * * *

. "The claim recorded as above set forth, shall preserve the privilege against the property for a period of one year from the date of its recordation and may be enforced by a civil action by any court of competent jurisdiction in the parish in which the land is situated and such cause of action shall prescribe within one year from the date of the recordation of the claim in the mortgage records of the office of the clerk of court or recorder of mortgages. The effect of the recordation of the claim shall cease and the privilege preserved by this recordation shall perempt unless a notice of filing of suit (giving the name of the court, the title and number of the proceedings and date of filing, a description of the property and a reference to the recorded con-

as obligees and neither the bond nor the contract for which it was given is recorded? Then, if the bond can be statutory under these circumstances, did the parties intend it as a statutory bond?[6]

A. Did the bond contain the conditions necessary to be a statutory bond, if it was intended as such?

The bond was conditioned on the full performance of the contract and the contract called for Offshore to pay all claims of furnishers, suppliers, and those rendering services.

By express provision, the bond incorporated the contract. Section C, paragraph 12(a) of the contract reads as follows:

"Contractor shall indemnify and save *Texaco* harmless from all claims, demands, causes of action or suits of whatever nature arising out of the services, labor, and materials furnished by Contractor or its subcontractors under this contract."

Section C, paragraph 12(b) gives Texaco the right to settle claims or withhold contract funds if the contractor fails to "promptly and satisfactorily settle all claims for labor performed and supplies or materials furnished."

The bond contains the following terms:

*"Now therefore, the condition of the above obligation is such,* That if the above bounden Principal [Offshore] shall well and truly keep, do and perform, each and every, all and singular, the matters and things in said

contract set forth and specified to be by the said Principal kept, done and performed at the time and in the manner on said contract specified, and shall pay over, make good and reimburse to the above named Obligee [Texaco], all loss and damage which said Obligee may sustain by reason of failure or default on the part of said Principal, then this obligation shall be void, otherwise to be and remain in full force and effect."

Continental argues that the bond "contains no payment obligations [to the furnishers, suppliers, and persons rendering services] as required by the statute," and is therefore not statutory. The statute contains no such obligation, but requires only that the bond be conditioned upon the payment of such claimants. The bond here meets this requirement.

An analysis of statutory history disproves Continental's argument. A predecessor of § 9:4802, Act No. 180 of 1894, required that the bond be given as "good and solvent security to the full amount of the contract for the payment of all the workmen, mechanics and laborers and all those who furnish materials and supplies actually used in the building." The question arose in Hughes v. Smith, 1905, 114 La. 297, 38 So. 175, as to whether a bond whose stated object was to indemnify the owner also covered furnishers and laborers. The court felt that the statute probably contemplated two bonds—one for the owner and one for furnishers and

---

tract), on said claim is recorded within one year from the date of the recordation of the inscription of the said claim. Such notice of filing suit shall preserve the privilege until the court in which the suit is filed shall order the cancellation of the inscription of the said claim and the notice of filing of suit on said claim or until the claimant authorizes the clerk of court or recorder of mortgages to cancel the said inscriptions." La.Rev.Stats. § 9:4802.

The statute also provides the procedure for making a claim against the owner, and provides for the erasure of the inscription of the contract from the records if no claim is timely filed.

6. It is also contended that the bond is conventional because it does not refer to § 9:4802. But while the Louisiana courts often take note that a bond refers to a statute, Monroe Hardware Co. v. Thompson, 1926, 162 La. 335, 110 So. 495; Lhote Lumber Mfg. Co. v. Dugue, 1905, 115 La. 669, 39 So. 803, neither the current statute nor any of its predecessors contain any requirement that the bond is to have reference to the statute under which it is given. *See,* Salmen Brick & Lumber Co. v. Owen, 1929, 10 La.App. 326, 121 So. 201.

laborers. But, the court noted, if one bond was to be sufficient, "it should clearly appear from the terms of the instrument that it was intended to secure the statutory beneficiaries [furnishers and laborers], who are the real obligees." 38 So. at 176. A similar result was reached in Salmen Brick & Lumber Co. v. Le Sassier, 1901, 106 La. 389, 31 So. 7, and Lhote Lumber Mfg. Co. v. Dugue, 1905, 115 La. 669, 39 So. 803.

The Louisiana Legislature settled the issue of whether there should be one bond or two, indicating that but one bond was needed to protect both the owner and the furnishers and laborers. But it did so in language which required that statutory obligees be specified in the bond. Act No. 134 of 1906 reads in part:

"The owner of such work shall require of said undertaker, contractor, master mechanic or engineer a bond with good and solvent surety for not less than one-half of the amount of the contract price, which bond shall be attached to and recorded with the contract in the mortgage office as above set forth, and the condition of which bond shall be the true and faithful performance of the contract, and the payment of all sub-contractors, workmen, laborers, mechanics, and furnishers of materials by the undertaker, contractor, master mechanic or engineer, *the said bond to be made in favor of the owner, sub-contractors, workmen, laborers, mechanics and furnishers of materials jointly, as their interests may appear.*" (Emphasis supplied.)

The emphasized language was repeated in subsequent amendments, Act No. 167 of 1912, Act No. 221 of 1914, Act No. 262 of 1916.

A major alteration in the statutory language was made by Act No. 139 of 1922. It reads in part:

" * * * the conditions of the bond shall be the true and faithful performance of the contract and the payment of all sub-contractors, journeymen, cartmen, truckmen, workmen, laborers,

mechanics, furnishers of materials jointly as their interest may arise."

As can be seen by comparing this language with that of the 1906 Act, the Louisiana Legislature dropped the requirement that workmen and furnishers be named as obligees in the bond. This was the interpretation placed on Act No. 139 of 1922 by the Supreme Court of Louisiana in Minden Presbyterian Church v. Lambert, 1929, 167 La. 712, 120 So. 61. The current statute, § 9:- 4802, is substantially the same as the one dealt with in Minden.

The bond in the instant case, conditioned on the performance of the contract terms which called for Offshore to pay furnishers and workmen, contained the requisite conditions to make it a statutory bond.

B. Can the bond be statutory even though neither the contract nor the bond was recorded?

Recordation of the contract has no connection with existence of liability under the bond. It is merely a means by which the owner may limit his personal liability. If an owner does not record the contract, claimants may protect their claims by filing them under § 9:4812. Such filing, if the contract is not recorded, creates personal liability in the owner. Further, if the owner records the contract and fails to require a sufficient bond or fails to record the bond, this also makes him personally liable. See § 9:4806.

But § 9:4807 completely refutes the argument that the contract and/or bond must be recorded if the bond is to be considered statutory.

"§ 9:4807. Release of surety

"Failure of the owner to record the contract and bond, or failure to obtain a sufficient bond shall not release the surety as to the owner, who shall have full recourse against the said surety up to the amount of the bond for whatever he may have to pay to complete the building or other work, or to satisfy the claims of all those who have

done work thereon or furnished services or material therefor and who have not been paid by the contractor, subcontractor, or other persons performing the said work; *nor shall such failure deprive any claimant of his rights against such surety.*" (Emphasis supplied.)

Monroe Hardware Co. v. Thompson, 1926, 162 La. 335, 110 So. 495, upheld the claim of a furnisher against the surety when neither the contract nor the bond was recorded. Continental correctly points out that *Monroe* is distinguishable because the bond in that case expressly stated that it was statutory—an unequivocal expression of intent. We must therefore look at the record to determine the intent of the parties here.

The intention of Texaco is beyond dispute. In its letter of April 19, 1962, Continental and Offshore, Texaco stated:

"[I]t is the position of Texaco that the primary obligation of satisfying these current claims and demands and any others that may arise, as well as the full performance and satisfaction of all other obligations under the subject contract, rest entirely with the Offshore Gathering Corporation and its surety, Continental Casualty Company. *Accordingly, Texaco, Inc. demands that all outstanding and future claims for labor and services performed, equipment rented, supplies or materials furnished or any other matter arising in connection with the above captioned contract be promptly and satisfactorily settled by Offshore Gathering Corpo-* *ration and Continental Casualty Company.*" (Emphasis supplied.)

Texaco's letter to United Tugs' attorney, May 17, 1962, contains similar language expressing Texaco's position holding Continental primarily liable.[7]

It is true that Continental in its correspondence never acknowledged personal liability. To the contrary, it denied such liability.[8] Continental repeatedly stated that it had executed only a "performance bond."[9]

But "performance of the construction" and "performance of the contract" are two different matters. Continental can hardly argue that it bonded only the former by a bond conditioned on the principal's performance of "the matters and things in said contract set forth and specified to be by the said Principal kept, done and performed * * *," where the contract required the principal to hold Texaco harmless for all claims for labor and materials.

Continental issued its bond in light of these contract terms, and did so in language which draws the bond within the sweep of the statute. Continental has failed to demonstrate a contrary intention.[10]

We therefore affirm the district court's finding that the bond here was statutory and that Continental can be personally liable under the bond.

III. *Applicability of Louisiana Oil Well Lien Statute.*

The district court held that the Oil Well Lien Statute, La.Rev.Stats. 9:4861, covered the pipeline [11] since it is used in

---

7. The relevant portion of the letter is quoted at 279 F.Supp. 501.

8. Letter of April 6, 1962, to Mr. Diaz, attorney for United Tugs.

9. Letter of April 28, 1962, to Texaco.

10. There is no evidence that "the premium exacted for the bond was less than is customarily charged for a bond, the obligation of which is coextensive with the statutory requirements." Salmen Brick & Lumber Co. v. Owen, 1929, 10 La.App. 326, 121 So. 201, 203. Contracts are presumed to be entered into with relation to the laws which govern them, and the bond statutes are "not intended to benefit, and should not be construed to the interest of the surety companies." *Salmen Brick, surpa,* at 203.

11. "§ 4861. *Privilege for labor, services or supplies*
 "Any person who performs any labor or service in drilling or in connection with the drilling of any well or wells in search of oil, gas or water, or who performs any labor or service in the

operation of the wells. Texaco takes the position that once the oil leaves the wellhead and enters the pipeline it is being transported, and this transportation does not constitute a part of the operation of the wells.

The district court drew a distinction between a "transmission" and a "gathering" pipeline and found this to be the latter. The district court found support in McGee v. Missouri Valley Dredging Co., La.App.1966, 182 So.2d 764, where a transmission line was held not to be covered by the § 9:4861. The McGee court said the following in dictum:

"It is obvious that a 24 inch and a 30 inch pipeline are a transmission line. There is no allegation or proof in this record that the pipelines are a part of the gathering system of producing gas wells."

182 So.2d 764, 767.

 Texaco objects to this reliance on McGee dictum, but the term "gathering" was not created by McGee. The Natural Gas Act of 1938, 15 U.S.C. § 717 et seq., exempts "the production or gathering of natural gas" from Federal Trade Commission jurisdiction. 15 U.S.C. § 717(b). Justice Black defined these terms in his dissenting opinion in Federal Power Commission v. Panhandle Eastern Pipe Line Co., 1949, 337 U.S. 498, 518, 69 S.Ct. 1251, 93 L.Ed. 1499, " 'Production' of gas [means] the act of bringing forth gas from the earth, and 'gathering' [means] the act of collecting gas after it has been brought forth." [12] Thus gathering pipelines are exempt from the Act's coverage even though they may lead into interstate transportation lines.

If a pipeline is classified as a local gathering line, can it be said to be used in connection with the operation of wells? The demarcation between being or not being used in connection with a well must exist at some point, and the district court decided that in the instant

operation or in connection with the operation of any oil, gas or water well or wells, has a privilege on all oil or gas produced from the well or wells, and the proceeds thereof inuring to the working interest therein, and on the oil, gas or water well or wells and the lease whereon the same are located, and on all drilling rigs, standard rigs, machinery, appurtenances, appliances, equipment, buildings, tanks, and other structures thereto attached or located on the lease, for the amount due for labor or service, in principal and interest, and for the cost of preparing and recording the privilege, as well as ten per cent attorney's fees in the event it becomes necessary to employ an attorney to enforce collection. Any person who does any trucking, towing, or barging, or who makes any repairs, or furnishes any fuel, drilling rigs, standard rigs, machinery, equipment, material or supplies for or in connection with the drilling of any well or wells in search of oil, gas or water, or for or in connection with the operation of any oil, gas, or water well or wells, whether or not a producing well is obtained and whether or not such materials, machinery, equipment, services and supplies are incorporated in or become a part of the completed oil, gas or water well, has a privilege on all oil or gas produced from the well or wells and the proceeds thereof inuring to the working interest therein and on the oil, gas or water well or wells and the lease whereon the same are located, and on all drilling rigs, standard rigs, machinery, appurtenances, appliances, equipment, buildings, tanks and other structures thereto attached for drilling, equipment and operation of the well or lease, for the amount due for such trucking, towing, barging, repairs, fuel, drilling rigs, standard rigs, machinery, equipment, material, or supplies, in principal and interest, and for the cost of preparing and recording the privilege, as well as ten per cent attorney's fees in the event it becomes necessary to employ an attorney to enforce collection thereof. This privilege is second in rank only to the privilege granted in favor of laborers."

12. This definition was followed in Saturn Oil & Gas Co. v. Federal Power Commission, 10 Cir. 1957, 250 F.2d 61, which found the definition consistent with the Supreme Court's language in Colorado Interstate Gas Co. v. Federal Power Commission, 1945, 324 U.S. 581, 65 S.Ct. 829, 89 L.Ed. 1206 and Interstate Natural Gas Co. v. Federal Power Commission, 1947, 331 U.S. 682, 67 S.Ct. 1482, 91 L. Ed. 1742.

case it was not to be at the wellhead. That the fluid moves from the well to the inland facility under the original pressure from the bottom of the well, while not decisive, supports the conclusion that the pipeline is used in operation of the well.

Neither are we impressed with Texaco's argument that it could have chosen another method for the removal of its oil. We adhere to the district court's discussion of the subject:

> "[R]egardless of whether the pipeline is the only available method or not, it is the method that was used, and without some method of transporting production the wells could not be commercially operable. Of course, Texaco could begin to barge the oil away, but then the barges would be used in connection with the operation of the well. The statute recognizes this, and it gives a lien to '[a]ny person who does any * * * barging * * * in connection with the operation of any oil * * * well or wells * * *.'"

279 F.Supp. 503.

Texaco points to Louisiana's Pipeline Statute, L.S.A.–R.S. 45.251, *et seq.*, as an indication that state law recognizes pipelines as being separate entities from well operations. This statute concerns common carriers, those who transport oil for hire. Standard Oil Co. of Louisiana v. Louisiana Public Service Comm'n, 1923, 154 La. 557, 97 So. 859. Texaco makes no contention that the pipeline here comes under the classification of "common carrier" or is subject to regulation by the state public service commission (as an intrastate carrier) or the federal authority (as an interstate carrier).

But because the Pipeline Statute gives the Louisiana Public Service Commission control over pipelines and appurtenant fixtures and not over the oil wells to which they may be connected, Texaco concludes that, "There appears to be a distinctive line drawn throughout Louisiana's above Pipeline Statute, separating a pipeline's own particular operations and functions from those of the oil wells which supply them." We disagree. The line is drawn between functions which are or are not those of a common carrier. For example, a common carrier pipeline hooked up to a gathering pipeline would not likely give the state public service commission authority over the gathering line as an "appurtenant fixture." When no common carrier is involved, the statute's language contains no imperative as to what should be the scope of the Oil Well Statute's lien coverage. We find unconvincing Texaco's argument that if the Louisiana Legislature intended pipelines to be covered by § 9:4861, it would have stated so expressly. We do not so readily infer that pipelines contemplate a different phase of the industry than the "operation of a well." The removal of fluids from the well site was clearly contemplated by the statute in that an express lien is granted for those who do any trucking, towing, or barging in connection with the operation of a well. An express listing of "pipelines" was not needed since the statute included "all drilling rigs, standard rigs, machinery, appurtenances, appliances, equipment, buildings, tanks and other structures *thereto attached* for drilling, equipment and operation of the well." R.S. 9:4861. [Emphasis supplied.]

Accordingly, the district court was correct in holding that the Oil Well Lien Statute, R.S. 9:4861, applied to the pipeline involved.

IV. *Recordation of Liens Under Oil Well Statute.*

The district court held that recording of a § 9:4861 lien was not required in order to preserve the lien against the owner, Texaco. This holding was based on § 9:4862, which statute reads in part:

> "If a notice of such claim or privilege * * * is filed for record and inscribed * * * within ninety days * * *, the privileges are superior to all other privileges or mortgages against the property, except taxes or a bona fide vendor's privilege, or privi-

leges or mortgages filed or recorded prior to the date on which the first labor, service [etc.] * * * covered by the privilege herein granted is furnished."

The Louisiana Constitution, Art. 19, § 19, provides: "Privileges on movable property shall exist without registration of same except in such cases as may be prescribed by law."

The district court felt that the "clear implication" of § 9:4862 was that recording establishes and preserves the ranking of a privilege, and that the lien exists separately from recordation. The effect of this interpretation was to allow lien rights in Texaco's lease interests to seven claimants who had made no recordation.

■ ■ The district court was eminently correct, for the rule in Louisiana is that where a statute grants a priority to a lien recorded within a certain time, failure to record within that time forfeits the priority only. If filed later, it is given full effect from the date of recordation.[13]

■ ■ Texaco points to a prior enactment of §§ 9:4861 and 9:4862 as containing in its official title the phrase, "providing for the time within which such liens and privileges must be recorded to be effective." Act No. 68 of 1942. But the present form of the statute title and text contain no such imperative.[14]

■ There is no issue here of the validity of unrecorded liens asserted against unknowing, innocent third parties. Therefore, such cases as Mercantile National Bank v. J. Thomas Driscoll, Inc., 1940, 194 La. 935, 195 So. 497, and Pertuit v. Angelloz, La.App.1964, 164 So.2d 125, which required liens to be filed under § 9:4862 to be effective against third parties, are not inconsistent with the result reached here. Those cases are a part of the body of Louisiana lien law which emphasizes the importance of filing liens in order to put third parties on notice that a claim may be made. But the owner and the surety of the contractor do not fall into the class of parties recognized by the law as persons who might be unaware of the work recently done and thus need notice.

The district court's finding that liens provided for under R.S. § 9.4861 need not be filed in all cases is affirmed.

### V. Crewboat Services.

Three claimants, Irby Charping, E. N. Despaux, and Haeuser Boat Rental, who supplied manned crewboat services, were allowed to recover under the Oil Well Lien Statute, § 9:4861. The lien is granted to "any person who does any trucking, towing, or barging * * * or furnishes any * * * machinery, equipment * * *."

■ Texaco does not contest that vessels may in some instances be considered "equipment"—at one point in its

---

13. Le Goaster v. Lafon Asylum, 1923, 155 La. 158, 99 So. 22; Robinson-Slagle Lumber Co. v. Rudy, 1924, 156 La. 174, 100 So. 296; City of Shreveport v. Urban Land Co., 1933, 177 La. 357, 148 So. 256; Conservative Homestead Assoc. v. Guglielmo, 1933, 178 La. 471, 151 So. 899; Alcus v. Parkside Realty Co., 1935, 181 La. 773, 160 So. 409; Conservative Homestead Assoc. v. Ullrich, 1935, 182 La. 806, 162 So. 628.

14. Such imperative as was contained in the former title would be of dubious validity. Statute titles are required by Art. 3, § 16 of the Louisiana Constitution of 1921. They are intended as subject indicators,

Succession of Pipitone, 1944, 204 La. 391, 15 So.2d 801, but are not a part of the statutes, State ex rel. Thompson v. Department of City Civil Service, 1949, 214 La. 683, 38 So.2d 385. Article 3, § 16 has been interpreted to mean that a statutory text broader than its title is invalid, Thompson, supra, but the converse is not true, i. e., a title may be broader than the statute. Even if it were to be assumed that the title phrase "notice of privilege to be filed" would cover a compulsory filing requirement, we are unable to find this compulsory language in § 9:4862. See, In re Lent, W.D.La.1940, 34 F.Supp. 700.

supplemental brief, it refers to United Tugs' vessels as "manned equipment." It instead takes the position that crewboats conveying workmen engaged in *constructing* a pipeline do not come within the purview of the phrase "for or in connection with the operation of a well."

Since we hold that the pipeline here is used in the operation of the wells, it would be inconsistent to hold that the act of constructing the pipeline needed to put the wells in operation was not covered by the statute. We agree with the district court that these claimants may recover.

VI. *Food and Housekeeping Services Under the Oil Well Statute.*

■ The claim of J. Foods & Services, Inc., was for catering services furnished the employees on the Texaco job, including food, sanitary supplies, and housekeeping services, such as making beds and laundering bedding.

The district court found, and we agree, that many of the delivered supplies came within the definition of "equipment" as used in L.S.A.–R.S. § 9:4869. The district court relied on Sandel & Lastrapes v. City of Shreveport, La.App.1961, 129 So.2d 620, though that case did not interpret § 9:4861, for its definition of "equipment" as the "outfit necessary to enable contractors to perform the agreed services."

We affirm the district court's finding that food and the labor expended in preparing food are covered by the statute. The court below relied on Cox v. Crow, 1931, 18 La.App. 380, 137 So. 605, which interpreted a statute granting a lien to those who provided supplies used in manufacturing railroad cross-ties as including food. *Cox* also held that the preparation of food was included by necessity, even though the statute did not expressly include "services."

Texaco seeks support from Southern Gas Line v. Dixie Oil Co., 1931, 16 La.

App. 26, 133 So. 181, which stated in dictum that foodstuffs supplied to workers would not be covered by Act No. 298 of 1926, a predecessor of the Private Works Act, § 9:4801. But that statute was interpreted to mean that things which did not become a part of the improvement, e. g., foodstuffs, fuel expended or repairs on machinery, were not protected by liens.[15]

The Oil Well Lien Statute, § 9:4861, is not so limited. Furnishers of materials and supplies are protected "whether or not" these things "are incorporated in or become a part of" the well. Texaco's argument here must fail.

The statute uses the term "services" in two contexts. The first protects "[a]ny person who performs any labor or service" in connection with the drilling or operating of a well. The second comes in the following language:

"Any person who does any trucking, towing, or barging, or who makes any repairs, or furnishes any fuel, drilling, rigs, standard rigs, machinery, equipment, material or supplies for or in connection with the drilling of any well or wells in search of oil, gas or water, or for or in connection with the operation of any oil, gas, or water well or wells, whether or not a producing well is obtained and whether or not such materials, machinery, equipment, services and supplies are incorporated in or become a part of the completed * * * well, has a privilege * * *."

L.S.A.–R.S. § 9:4861.

In its second reply brief, Texaco concedes that the test is not whether the things provided are "incorporated" into the improvement, and argues that the test is not whether the things are "necessary" to maintain work crews. The test, it is argued, is whether the services, supplies, equipment or material provided fit squarely within the express statutory provisions.

15. *See also*, Board of Levee Commissioners v. Hulse, 1929, 167 La. 896, 120 So. 589, which held that foodstuffs consumed by workmen were not within the purview of "supplies" as used in the Public Works Statute, L.S.A.–R.S. 38.2241.

Texaco argues persuasively that the use of the term "services" in the statute's "whether or not incorporated" clause has reference only to the specific services preceding it, and that housekeeping and catering services would not fit into any of the enumerated services. But this argument ignores the lien granted in the first sentence of the statute to any person who performs labor or services.

This lien is not limited strictly to the individual who performs the work, but may be asserted by a company who provides the workers. Prior statutes granted the lien to "any person, firm, corporation, or association."[16] The phrase was shortened to "any person" by the codification in 1940, apparently with no change in meaning intended.[17]

We can find no reason for limiting the lien granted to "any person who performs any labor or service" in connection with the drilling or operation of any well to the individual who actually does the work. The district court's finding that J. Foods & Services may recover under § 9.4861 is affirmed.

VII. *Manned Equipment Rentals Under the Private Works Act.*

The Private Works Act, § 9:-4801, provides a lien for "every contractor, sub-contractor, architect, engineer, master-mechanic, mechanic, cartman, truckman, workman, laborer or furnisher of material, machinery or fixtures, *exclusive of anyone who rents or leases movable property*, who performs work or furnishes material * * *." The em-

phasized phrase was added by Act No. 60 of 1960.

The statutory language prior to the 1960 amendment was interpreted as excluding rentals of unmanned equipment. National Surety Corp. v. Highland Park Country Club, Inc., La.1960, 240 La. 747, 125 So.2d 151. The statute was held to protect only those furnishers of machinery *who perform work.*

The district court felt that the amendment was enacted for clarification purposes, and was not intended to exclude manned equipment rentals.[18] This conclusion is supported by an analysis of the class of things the statute is designed to protect; namely, those who provide labor, materials or supplies incorporated into or exhausted by the construction and those who sell machinery or equipment or furnish fixtures.

A renter of unmanned equipment receives his property back at the completion of the agreement. Those who are protected by the statute do not have the same expectation of recovering that which was theirs. When manned equipment is rented out, the person who provides this service is brought within the category of providing work—a nonreturnable item, and fits within the class of persons which the Legislature sought to protect.

VIII. *United Tugs as a Subcontractor.*

The district court found that United Tugs was a subcontractor and as such entitled to recover under the Private Works Act, § 9.4801.[19] Its defini-

---

16. See Act No. 100 of 1940, Act No. 145 of 1934.

17. The enumerated services in the latter part of the statute—trucking, towing, barging, and repairing—cannot be read to limit the "service" protected in the first sentence of the statute. Persons who transported the oil, gas, or water from wells were specifically protected by Act No. 145 of 1934. It is likely that this was a response to Green v. Hawkins and Antoon, La.App.1932, 142 So. 742, which had held that trucking was not protected by the previous Oil Well Statute, Act No.

171 of 1928. The enumeration of "repairs" was made in light of Rester v. Moody & Stewart, 1931, 172 La. 510, 134 So. 690, which had held that the Public Works Statute's protection for those who furnished "materials and supplies for use in machines" did not encompass repairs to machines.

18. The district court relied on a commentator, Robert Pascal, 21 La.L.Rev. 62.

19. Whether or not United Tugs was a subcontractor, we have held that it is still protected by the Act as a renter of manned equipment.

tion of "subcontractor" is found at 310 F.Supp. 1217.

Texaco argues that the charter agreement between United Tugs and Offshore was merely a rental agreement, since United Tugs was to be paid on a rate per day basis. But if the terms of the agreement were to be the controlling factor, Texaco's argument would likely be unavailing since the agreement states on its face, "it being the intent of the parties hereto that the Owner [United Tugs] shall be and shall at all times remain an independent contractor."

But the district court's determination was not narrowly limited to the words of the agreement; it was based on the work done by United Tugs. This is indicated by the disposition of a similar claim by Irby Charping, whose manned crewboat services were used to transport workers to the job site. The district court said:

> "Since Charping's work was done primarily away from the job site and was not directly concerned with the onsite construction, he is not a subcontractor as contemplated by the Private Works Act, but he is a furnisher of manned equipment or machinery."

310 F.Supp. at 1223.

■■ Since Texaco does not otherwise dispute the district court's definition of "subcontractor," the decision of this issue is affirmed.[20]

### IX. *Texaco's Personal Liability to United Tugs and Jordan.*

The district court, on the basis of certain oral representations, held Texaco personally liable to United Tugs and Jordan for part of the money owed them by Offshore. A preliminary question is whether parol evidence may be used to prove these promises.

■■ Under Louisiana law, promises to pay the debts of third parties are in the nature of suretyship[21] and as such are unenforceable unless in writing.[22] And, La.Civ.Code, Art. 2278(3) specifically prohibits the use of parol evidence to prove any promise to pay the debt of a third person.

■■ The Louisiana courts have fashioned an exception to this parol evidence rule. Whenever a promisor unconditionally obligates himself to pay the debt of another, he becomes primarily responsible for the debt. In this situation, the use of parol evidence is not prohibited by Art. 2278(3).[23] There is no doubt that under Louisiana law two parties may bind themselves for the

---

20. Contrary to the contentions of Texaco, the treatment of United Tugs is not inconsistent with that of the three crewboat claimants, Charping, Despaux and Haeuser (discussed in section V). These claimants were not subcontractors because their work was not sufficiently connected to the job site, but all were renters of manned equipment.

Charping could not recover under the Private Works Act because he had failed to reinscribe his lien. He was allowed to recover against Continental on the bond since claims are valid against the surety under the Private Works Act regardless of the filing of liens. Monroe Hardware Co. v. Thompson, 1926, 162 La. 335, 110 So. 495; Bell v. Lieber, 1930, 169 La. 731, 125 So. 871.

Despaux had filed no lien and thus had no Private Works Act lien to enforce, but was similarly allowed to recover against Continental on the bond.

Haeuser filed no liens and failed to intervene in the Continental interpleader. It therefore could not recover under the Private Works Act, and had failed to make itself a party to the suit under which it could have recovered from the the surety.

All of these claimants were successful in part by virtue of their oil well liens which need not have been recorded (see surety.

21. National Materials Co. v. Guest, La. App.1933, 147 So. 771; Brown and Root, Inc. v. Gifford-Hill & Co., 5 Cir. 1963, 319 F.2d 65; Fuselier v. Hudson, La.App. 1957, 93 So.2d 266.

22. La.Civ.Code, Art. 2093.

23. Hornsby v. Rives, La.App.1941, 2 So.2d 532; Watson Bros. v. Jones, 1910, 125 La. 249, 51 So. 187.

same debt and do so not in the relationship of principal and surety. *Watson, supra.*[24]

■ Texaco's position is that any promises it made to pay United Tugs and Jordan were in reference to paying them out of the funds it retained from Offshore. The district court concluded that the evidence showed the promises were independent of the retainage, and thus unconditional. See 279 F.Supp. 490, at 505.[25] This finding is not clearly erroneous.

### A. *Claim of United Tugs.*

When Offshore fell substantially behind in its payments due United Tugs and informed United Tugs' president, Emmett A. Eymard, that it was unable to make payments, Eymard informed Texaco that he would have to remove his vessels from the job. Eymard met

24. The litigants here debate at great length the importance of the element of pecuniary interest Texaco had in making its promises. While pecuniary interest may be a prerequisite for enforcing oral promises to pay the debts of another, Eunice Clinic & Hospital v. Baldwin, La. App.1936, 167 So. 868; Webb v. Shreveport Packing Co., Inc., La.App.1938, 180 So. 843; Rube v. Pacific Insurance Co., La.App.1961, 131 So.2d 240; Custom Contract Co. v. Nims, La.App.1962, 145 So.2d 374; Coen v. Toups, La.App.1964, 168 So.2d 893, its presence does not necessarily transform the promise from conditional to unconditional, *Brown & Root, supra;* Gateway Barge Line, Inc. v. R. B. Tyler Co., La.App.1965, 175 So. 2d 867. But a decision on this issue is not necessary here, for we agree with the district court that Texaco's promises to pay were unconditional.

25. Appellants strenuously object that this conclusion, found in the original opinion, is not consistent with the finding that "Texaco officials did unequivocally [sic] promise United and Jordan that if they would let their equipment remain on the job, Texaco would see to it that United and Jordan were paid out of the retainage Texaco then had in its possession, which was due Offshore." 279 F.Supp. 490, at 504.

This objection was raised below, and answered by the district court in its second opinion:

with James Harvey Gibbens, general superintendent of drilling and production for Texaco, and, according to Eymard, was assured that United Tugs would be paid either out of the retainage or by virtue of Continental's bond. Eymard and an employee of United Tugs, Sidney Savoie, met with Gibbens a week or ten days later, on April 2, 1962, along with Winn Harvey of Offshore. Eymard and Savoie testified that Gibbens made further assurances that payment would be forthcoming.

Gibbens testified that he told the parties, if Offshore would authorize Texaco to issue a check jointly payable to Offshore and United Tugs out of the retained funds, Texaco would do so at the completion of the contract. Offshore issued two separate authorizations, but Gibbens testified that he refused to honor them because the authorizations were

"I did find as a fact that Texaco's promise and guarantee to United and Jordan was to the effect that they *would* be paid out of *retained* funds, but Texaco went further than that and assured Jordan and United that the retained funds would amount to more than enough to pay their claims. Having done so, Texaco cannot now supply its own proviso that it would pay only if funds were available, or if funds were available United and Jordan must take their place in line with all the other creditors. Texaco induced United and Jordan to leave their equipment on the job so that the job could be finished without interruption. Jordan and United cooperated, relying upon Texaco's promise that they would be paid. Texaco may not later default on its promise by saying that what it meant was that it would pay *if* there were no other creditors *and if* the retained funds were sufficient to take care of it, and. *if* it is otherwise legal to pay out the money. United and Jordan relied on Texaco's promise that they would certainly be paid because they, and everyone, knew by then that Offshore was in serious financial difficulty. Texaco, therefore, is liable personally to United and Jordan on its independent promise that they would be paid."
310 F.Supp. at 1213.

to pay United Tugs "direct," whereas he had agreed only to issue a joint check.

Texaco never attempted to inform anyone of the difference it chose to see between the agreement and authorization, nor has it sought to defend this dichotomy before this Court.[26]

On April 9, 1962, Texaco inquired of Continental if payment could be made out of the retained funds to Offshore's creditors with Continental's approval. At a meeting on April 27, 1962, Texaco agreed not to pay out any retained funds per Continental's request.

Texaco was aware no later than April 19, 1962 that the retained funds would be inadequate to meet the demands of all claimants.[27] When United Tugs' attorney, Mr. Diaz, informed Texaco that he was filing a lien on the pipeline, Texaco requested that he hold off enforcing it, assuring him that it was attempting to work out a payment procedure. Nothing was said about the inadequacy of the retainage. Diaz was amenable; he waited until May 10, 1962, and then requested assurance that United Tugs would be paid within 45 to 60 days. Failure to do so, Diaz felt, would force United Tugs to remove its tugs. At this point Texaco informed Diaz that it denied all liability and that it was not free to pay out any of the retainage. United Tugs then removed its vessels, and they were returned to work only when Offshore agreed to pay for them on a day-to-day basis.

The record is replete with testimony from Eymard and Savoie that Gibbens represented to them that United Tugs should have no worries about being paid and that the retainage was adequate to cover their claim. Gibbens denied discussing the adequacy of the retainage, but at most this constituted a choice of credibility for the district judge, and we will not disturb his finding here. While it might be true that all assurances made by Texaco were linked to the retainage, this is no defense to its actions.

Texaco's representations induced United Tugs to act to its detriment and to Texaco's benefit. In its brief, Texaco has taken great pains to distinguish precedential cases on their facts—but facts do not alter principles of law, only their application. Bearing this in mind, we draw from the teaching in Peoples National Bank of Little Rock v. Linebarger Construction Co., 1951, 219 Ark. 11, 240 S.W.2d 12. In that case an agreement was reached by which a bank made monthly advances to a subcontractor to meet his payroll. Each month, the contractor informed the bank what amount would be due the subcontractor at the end of the month; the bank would be reimbursed for the advances by the contractor via joint check to the bank and the subcontractor. All went well until a problem arose with the work being performed, and the contractor refused to pay the bank for its most recent advance. The court's findings in part are as follows:

"[O]n August 12th, at a time when Linebarger [contractor] * * * knew that Cart [subcontractor] was not properly performing the subcontract and was neglecting the work, Linebarger wrote the Bank that on September 15th Linebarger would owe Cart $16,000.00.

"Under the rule of promissory estoppel, and in view of all the course of dealings, we hold (a) that Linebarger's letter of August 12th was a representation by Linebarger that on September 15th it would issue its check to the Bank and Cart for any amount—up to $16,000.00—that the Bank might advance to Cart to meet his payroll; (b) that the Bank was justified in relying on Linebarger's representations and in advancing Cart money * * * ; and (c) Linebarger is now estopped from denying the

26. When Eymard went to Texaco's offices shortly after April 2, 1962, he was told only that his check was being delayed due solely to bookkeeping reasons.

27. Letter from Texaco to Continental with a copy to Offshore, dated April 19, 1962.

promissory representations contained in the letter of August 12th."
240 S.W.2d at 17.

While the facts of *Linebarger* by no means parallel those of the case at hand, we have no difficulty in adhering to the principle that one cannot reap benefits without liability when he has induced another to act to his detriment.

There was evidence to show that Texaco assuaged United Tugs' fears of financial loss by reference to the retainage without mentioning that it might not be adequate, and said nothing to United Tugs when the inadequacy became certain. There was no mention made by Texaco that it felt obligated to procure Continental's approval to pay out money from the retainage, or that Continental could take the position that the bond was not a payment bond.

If Texaco had been open and candid with United Tugs, the latter could have made a knowledgeable, intelligent decision to continue working. But apparently Texaco did not wish to run the risk that United Tugs would not have been satisfied once it knew the full situation, and might have required Texaco to make concrete, unambiguous promises of payment or face the loss of United Tugs' services. Rather than risk this, Texaco affirmatively took the position that United Tugs had nothing to worry about.

The record shows that Texaco procured United Tugs' performance for over three weeks before notifying them that Continental's consent was being sought as a prerequisite to payment, and for over a month and a half before taking the position openly that it disavowed all personal liability and could not pay out any of the retainage without Continental's consent. This performance obviously held a high value for Texaco, and Texaco showed that it was willing to go to great lengths—short of actually paying out any money—to procure performance.

We therefore affirm the district court's finding that Texaco cannot now assert the defense that what it meant by its promises was that it would pay out of the retainage only if the funds were adequate.

**B.** *Claim of Thomas Jordan, Inc.*

The operative facts of Jordan's claim are different but lead to the same conclusion. There was testimony from two Jordan officials, Edmund H. Crane and Charles P. Christman, that they were assured Jordan would be paid out of the retainage at the completion of the contract and that the retainage was adequate. Crane testified Gibbens told him that Texaco would pay Jordan's claim rather than have a lien filed, and that no lien was filed for this reason. While Gibbens denied he ever expressly stated the claim would be paid separately and independently from the retainage, there were adequate grounds to justify the district court's finding that Texaco made itself personally liable to Jordan.

Jordan stayed on the job from the date of these conversations, early April 1962, until completion of the contract. Texaco said nothing to Jordan when it became apparent that the retainage would not be adequate to pay all claimants. Jordan filed no lien and made no demand for payment until August 16, 1962, when the work was completed. At this time Texaco denied all liability and referred Jordan to Continental's bond.

The district court's finding that Texaco was personally liable to Jordan is affirmed.

**C.** *Validity of Assignments.*

Both United Tugs and Jordan asserted that Offshore had assigned portions of the retainage to them, but these claims were denied by the district court on the ground that the assignments were not consented to in writing by Texaco, as called for by the contract.

We agree as to United Tugs, but find that Jordan's claim to an assignment should have been sustained.

When Jordan sought payment from Texaco, Gibbens requested that Crane write a letter supporting the claim and procure authorization from Off-

shore to pay Jordan out of the retainage. Both conditions were fulfilled, and Texaco responded by letter dated April 6, 1962:

"We have received the following telegram from Offshore Gathering Corporation: 'We authorize Texaco pay direct to Thomas Jordan, Inc. $19,280.75 from retained funds. Please confirm compliance our request to Jordan.'

"We have no objection to recognizing the above direction for payment when our contract with Offshore Gathering Corporation has been completed."

No more was needed to constitute a consummated assignment which required written consent from Texaco. We hold that, as it affects Jordan, Texaco and Offshore, a valid assignment was executed for $19,280.75 of the retained funds.

Since the enforceability of this assignment as it affects other claimants is uncertain, Shreveport Producing & Refining Corp. v. City of Shreveport, 1932, 175 La. 61, 143 So. 5, and since this issue may be made moot by our affirming Texaco's personal liability to Jordan, we remand this matter to the district court for disposition in light of our holding.

### X. *Ellzey Marine Supplies.*

■ Ellzey Marine Supplies furnished a number of general hardware items to Offshore. Most of these items were picked up by Offshore personnel, some were delivered to crewboats at Texaco's dock, located next to Ellzey's place of business. A large number of invoices were introduced in support of this claim. The district court held:

"* * * Ellzey satisfactorily proved that some of his merchandise was used on the Texaco job but such proof was insufficient with respect to many items. On balance I hold that he is entitled to twenty-five percent of his claim * * *."

Texaco attacks this award as being arbitrary.

Ellzey responds by stating that the many invoices bore the number "129" which was identified as the job number for the Texaco job. However, since an examination of those invoices bearing this particular job number shows that they cover a far higher percentage of the Ellzey claim than was awarded by the district court, it is apparent that the issue below was whether these supplies covered by invoices bearing job number 129 were in fact used on the Texaco job.

The Ellzey witness could not verify the accuracy of the job number designation. Though, undoubtedly, some of the materials were for the Texaco job, we are unable to determine from the opinion of the court below what procedure was used to set the award at twenty-five percent. We must therefore remand for findings of fact on this point.

### XI. *Golden Meadow, Inc.*

■ Golden Meadow, a distributor of Texaco products, assserted a claim of $6,189.34 for supplies sold to Offshore. Though Golden Meadow introduced invoices showing the sales to Offshore, its claim was dismissed for failure to prove that the supplies were used by Offshore on this particular job.

The district court recognized the difficulty of proof when off-shore job sites are involved, and ruled that suppliers need only show by a preponderance of the evidence the likelihood that supplies were delivered to the particular job.

The dismissal of Golden Meadow's claim was the result of a credibility choice between its evidence and the testimony of Offshore's purchase manager. He testified affirmatively that he had responsibility for the purchase of supplies of the type Golden Meadow sells, and that such supplies were purchased elsewhere for this job. There was also evidence that Golden Meadow's supplies, though sold to Offshore, could have been used on another job.

We decline Golden Meadow's invitation to re-examine the evidence. Rule 52(a), Fed.R.Civ.P., requires that "due regard

shall be given to the opportunity of the trial court to judge of the credibility of the witnesses." Though no express findings of fact were made for this claim, we cannot say on this record that the district court's dismissal of Golden Meadow's claim was clearly erroneous. Zenith Radio Corp. v. Hazeltine Research, Inc., 1969, 395 U.S. 100, 89 S.Ct. 1562, 23 L.Ed.2d 129.

## XII. *Computation of the Retainage.*

The district court found that Texaco incorrectly computed the retainage because it omitted from its interpleader deposit $14,204.89, an amount due Texaco from Offshore for materials purchased from Texaco for the pipeline construction. No money exchanged hands; there was merely a credit entered for the Texaco sales department. A Texaco accountant testified that their "interdepartmental transaction" took place on October 31, 1962, long after Texaco's interpleader was filed.

If Texaco made such a credit at a time when it had a duty to hold the retainage for the benefit of all creditors, its action would be unjustified. There are two separate credits involved, one for $6,817.09 and another for $7,387.80.

■ We sustain the finding as to the latter amount. While Texaco claims that this credit was for materials used on the pipeline construction, there is no evidence as to when the materials were delivered or when Offshore became indebted to Texaco for their value. There is no evidence of the debt's existence prior to October 31, 1962.

Articles 2207 and 2208, La.Civ.Code, provide that compensation shall take place between two parties indebted to each other by operation of law as soon as the debts exist simultaneously. Texaco argues that these articles mean that it did not improperly credit its own sales department, since the transaction was completed by operation of law.

But this argument is unavailing insofar as the $7,387.80 credit is concerned since La.Civ.Code, Art. 2215 prohibits compensation taking place between debtors to the prejudice of third parties. But because there is no evidence that this debt existed until October 31, 1962, it cannot be said that compensation took place prior to that date. Article 2215 was therefore a bar to compensation at this late date.

■ But the transaction involving the $6,817.09 credit did not take place on October 31, 1962. Offshore submitted an invoice to Texaco, dated February 26, 1962, for work completed. Texaco entered a credit for the amount due it from Offshore on March 22, 1962, and issued a check for the balance on that date. The evidence that the transaction was completed on March 22, 1962 and that the credit was for supplies furnished offshore was uncontradicted. Whether the supplies were for this or another job is irrelevant, since Article 2207 does not require that the offsetting debts arise from the same transaction.

As of March 22, 1962, Texaco had no duty to withhold contract funds for any creditors of Offshore; no third party had any secured enforceable claim against these funds. The compensation occurred no later than March 22, 1962, and did not operate to "the prejudice of rights acquired by third parties." Art. 2215.

We hold that the amount of the interpleader deposit as determined by the district court should be diminished by $6,817.09.

## XIII. *Attorney's Fees Under Oil Well Statute.*

The privilege provided in L.S.A.–R.S. 9:4861 applies to

" * * * the amount due [for labor or service, or for such trucking, towing, barging, repairs, fuel, drilling rigs, standard rigs, machinery, equipment, material or supplies] in principal and interest, and for the cost of preparing and recording the privilege, as well as ten per cent attorney's fees in the event it becomes necessary to employ an attorney to enforce collection thereof."

■ Texaco contends that this provision for attorney's fees is ambiguous in that it does not expressly state the basis on which the fee is to be calculated.[28] Ambiguous statutes should be restrictively construed, and Texaco's conclusion is that the fee should be calculated on the original debt—the principal—only, and not on the principal plus interest.

We do not find the statute ambiguous. There is no basis for holding that a privilege "for the amount due * * *, in principal and interest, and for the cost of preparing and recording the privilege, as well as ten per cent attorney's fees * * *" limits the attorney's fee to ten per cent of the original amount due.

## XIV. *Interest Rate in Judgment.*

■ The district court awarded interest in the judgment at the rate of five per cent. Pursuant to Act No. 315 of 1970,[29] which raised the rate of legal interest in Louisiana from five to seven per cent, many of the claimants have moved in this Court to amend their judgments to raise the interest rate in their awards correspondingly from the effective date of the Act. La.Civ.Code, Art. 1940 provides that "the legal interest, at the time the contract was made, shall be recovered although the rate may have been subsequently changed by law." This article requires that claimant's motions to amend be denied.[30]

### *Conclusion.*

The judgments entered by the district court are affirmed in all respects with the exception of the following:

(a) The amount of the Texaco interpleader deposit of retainage as determined by the district court, $193,003.05, is to be reduced by $6,817.09;

(b) the assignment by Offshore Gathering Corporation of the retained funds in the amount of $19,280.75

to Thomas Jordan, Inc., was valid, and the judgment denying Jordan's claim on the assignment is reversed and remanded for determination consistent with this opinion;

(c) the entry of judgment in favor of Ellzey Marine Supplies for twenty-five percent of its claim is vacated and remanded for determination consistent with this opinion.

Costs of this appeal are taxed against Continental Casualty Company and Texaco, Inc. See Rule 39(a), F.R.A.P.

Affirmed in part, modified in part, and vacated and remanded in part.

28. Two other Louisiana attorney's fee statutes, L.S.A.-R.S. 38:2246 and R.S. 9:3902, state that the fee is to be calculated on the amount recovered, which would include interest on the principal.

29. Amending La.Civ.Code, Art. 2924.

30. *See* Hebert v. Travelers Insurance Co., La.App.1971, 245 So.2d 563, where Act No. 315 of 1970 was denied retroactive application.